UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert William JONES,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Donald Eugene JOHNSON,
Defendant–Appellant.

Nos. 89–5032, 89–5034.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 5, 1989.

Decided July 3, 1990.

James T. McBratney, Jr., Florence, S.C., argued, John Herman Hare, Asst. Federal Public Defender, Columbia, S.C., for defendants-appellants.

Alfred William Walker Bethea, Jr., Asst. U.S. Atty., Columbia, S.C., argued (E. Bart Daniel, U.S. Atty., Paul Stroebel, Third Year Law Student, Columbia, S.C., on brief), for plaintiff-appellee.

Before PHILLIPS and WILKINSON, Circuit Judges, and BRITT, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

PHILLIPS, Circuit Judge:

Donald Johnson and Robert Jones appeal from their 1988 convictions for armed bank robbery, in violation of 18 U.S.C. § 2113, and use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c), in connection with the June 6, 1988, robbery of Anchor Bank in Myrtle Beach, South Carolina. Johnson and Jones assign numerous errors in the admission of evidence and denial of their motions. They further contend that the district court incorrectly applied the Federal Sentencing Guidelines, resulting in both defendants being sentenced as career offenders under § 4B1.1 of the Guidelines. We affirm the convictions but remand for resentencing under the interpretation of the Guidelines we outline below.

I

Johnson and Jones were convicted after a four-day trial in September 1988. At trial, the government presented the testimony of an FBI expert, who evaluated bank surveillance photographs of the two

robbers, both of whom had worn sunglasses and baseball caps, but no masks, during the robbery. The expert identified the defendants as the men in the photographs after comparing the bank photographs with others of the defendants. He also identified sunglasses and baseball caps seized from a residence leased by Johnson and his cousin as those worn by the robbers in the photographs. In addition, the government presented the testimony of five eyewitnesses—four bank tellers and a bank customer—who identified Johnson in court as one of the robbers; two bank tellers identified Jones in court as the other. These witnesses also testified to their identification of the defendants at an earlier line-up.

Other evidence showed that Jones and Johnson were together when they were arrested and that both had in their possession at that time a large quantity of five-dollar bills with sequential serial numbers. The government presented other circumstantial evidence, including testimony that the defendants were in the area of the bank at the time of the robbery, that they had had no cash immediately before the robbery, and that just before he was arrested, Johnson denied that he was Donald Johnson when asked.

The jury found both defendants guilty on both counts. Following recommendations in the presentencing reports, the court sentenced both Johnson and Jones as career offenders under § 4B1.1 of the Sentencing Guidelines. As a consequence of that most extreme of criminal history classifications, Johnson was sentenced to twenty-seven and a half years in prison, and Jones to twenty-seven years.

## II

■ The first of the Johnson and Jones' assignments of error focuses on an allegedly improper comment made by the court:

> You will recall yesterday, I mentioned that there are a variety of reasons why a person accused of a crime may choose not to testify. And more often than not, that reason not to testify will have noth-ing to do with the merits of the case on trial.
>
> Sometimes a defendant has a not too complimentary background and does not wish the United States Attorney to have the opportunity to bring these matters out before the jury.
>
> And yet, such a person could be innocent of the offense being tried before you. So, that could be a reason a defendant might choose not to testify.
>
> So once again, if one or both defendants were to choose not to testify, you should place no inference against them in that regard, since the constitution affords them the right not to testify.
>
> I remind you that the defendants are presumed to be innocent. And the government must prove their guilt beyond a reasonable doubt.
>
> The defendants do not have to prove their innocence.

Joint Appendix at 81 (emphasis added).

The appellants point to the underlined portion of this excerpt from the trial judge's opening remarks and claim that this comment violated their fifth amendment right not to testify and to have no adverse inference suggested from the decision not to testify. They argue that the court's comment violated the dictates of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which forbids negative commentary on a criminal defendant's failure to testify.

Viewed in hindsight, the district judge's effort to drive home the irrelevance of a defendant's silence may have involved an improvident choice of example that was not worth the risk of misapprehension now seized upon by defendants. We do not condone it, precisely because of the obvious risk that in some contexts it could be prejudicial. But we are satisfied that, viewed realistically in total context of this case, it could not have been here. The remark was made as part of a strong admonition to the jury *not* to draw an unfavorable inference from silence, came before a four-day trial at which abundant evidence was presented, and was not repeated in the jury instructions, which included a cautionary state-

ment against adverse inference from silence. A jury would not "naturally or necessarily take [this] as a comment on the defendant's refusal to testify," *see United States v. Lorick*, 753 F.2d 1295, 1298 (4th Cir.1985), and any conceivable impropriety in the comment was surely cured by its immediate context and by a later cautionary instruction that omitted the allegedly offensive remark. *See id.*

### III

■ The appellants next contend that their right to an impartial jury was violated when two jurors saw them in handcuffs. They concede that a taint of this sort can be corrected if the court takes the necessary steps, but argue that in this case the court's general questions to each of the jurors were inadequate to ferret out bias.

Our review of the record indicates that the trial court was solicitous of the defendants' wishes on how to question the jurors and that, in fact, defendants' counsel had no objection at trial to the form of questioning. They now object to the generalized nature of the questions and to the fact that each juror was questioned. Ironically, both of these features were designed to *protect* the defendants: the general questions were meant to avoid any improper suggestion, and the blanket questioning was meant to test whether more than the two jurors might have heard about the handcuff scene.

Even assuming that these objections may now be heard, the questioning appears to have been thorough and careful. Each juror was asked whether he could reach a decision solely on the evidence and whether he had seen or heard anything out of court that might affect his decision. All answered no, and some were even probed further by the judge. In light of the trial court's broad discretion in conducting voir dire and in formulating questions for jurors, *United States v. Robinson*, 804 F.2d 280 (4th Cir. 1986); *United States v. Griley*, 814 F.2d 967 (4th Cir.1987), this form of questioning was not an abuse of discretion.

### IV

Johnson and Jones next challenge the line-ups in which they were identified. They make two arguments: (1) that they were denied their sixth amendment rights to counsel because, although their lawyers were present at the line-ups, they were not allowed in the witness' viewing room to monitor remarks of FBI agents conducting the line-up, and (2) the line-ups were overly suggestive because (a) other participants were joking with each other but not the defendants; (b) the others wore a variety of hats and sunglasses, but only the defendants wore ones like those used in the robbery; and (c) one of the defendants was required to repeat "Hit the floor!"—which the robbers had shouted—whereas the others said it only once. They contend further that the trial court erred in denying their motions to suppress both of these allegedly unconstitutional out-of-court identifications and tainted in-court identifications, which they claim had no independent basis.

■ We see no merit to the claimed violation of the right to counsel. Counsel was present in the line-up room with Johnson and Jones and had the opportunity to confer with them after the line-up. The appellants have cited no authority to the effect that counsel needs to be present in the witness room itself. There was testimony from one of the FBI agents that in his 22 years, lawyers had never been allowed in the viewing room. Furthermore, the defendants' counsel had opportunities to cross-examine the witnesses who made the identifications and the FBI agents who conducted the line-up, and a picture of the line-up was presented to the court when it ruled on the suppression motion.

■ Likewise, we see no merit to the various arguments that the line-up was impermissibly suggestive. As testimony heard on the suppression motion indicates, the defendants were themselves smiling, so that they did not stand out noticeably from the participants who were joking around; the defendants were given the chance to choose which set of hats and sunglasses they wanted to wear; and, finally, Johnson may have been asked to repeat "Hit the

floor!" but only because he had spoken softly the first time.

■ Because the out-of-court identifications were sound, the in-court identifications need not be justified by any independent basis. If such a showing were required, however, the government has presented ample evidence of the reliability of the identifications under the relevant factors set out in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

## V

■ The appellants next contend that the admission into evidence of some semi-automatic weapon ammunition seized from the defendants' residence was error. They argue that even though the court later withdrew that evidence and instructed the jury to disregard that evidence, its previous admission was nonetheless so inflammatory that the cautionary instruction was inadequate to cure the prejudice caused.

Of course, the only issue is the adequacy of the curative instruction; any question of admissibility is irrelevant because the evidence was finally kept out. After testimony from an FBI agent that he did not know whether the ammunition seized could fit a revolver, the appellants successfully moved to have the previously admitted evidence excluded, and the court gave the following warning to the jury:

> In that the court perceives no relationship to [sic] the box of ammunition to this case, the court has reconsidered its earlier ruling, admitting that item of evidence for your consideration.
>
> And I'm now removing it from evidence. And I ask that you give it no consideration.

Joint Appendix at 126.

■ It appears that the appellants neither objected to this instruction nor requested any additional instructions. Even if the issue is properly before us, however, it lacks merit. The jury is generally pre-sumed to be able to follow an instruction to disregard evidence, absent some strong indication that the evidence is so powerful that a jury could not ignore it and that the defendant would be harmed as a result. *Green v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). In light of the abundant evidence against the defendants, there is no reasonable probability that the jury's verdict was influenced by the jury's seeing this later-excluded evidence. *United States v. Barnes*, 747 F.2d 246 (4th Cir.1984).

## VI

■ The appellants next challenge the sufficiency of the evidence on their conviction under 18 U.S.C. § 924(c) for using a "firearm" to commit a violent federal crime. They contend that the only evidence that a firearm was used came from testimony of witnesses unfamiliar with firearms and from bank photographs. They argue that for a "firearm" conviction, at a minimum an expert should identify a firearm in bank photographs.

This argument is also without merit. The government need not present expert testimony to support a conviction under § 924(c). *See Parker v. United States*, 801 F.2d 1382 (D.C.Cir.1986). As five eye-witnesses testified that a gun was used in the robbery, there was evidence from which rational triers of fact could find guilt beyond a reasonable doubt on the firearms charge.

## VII

■ Finally, at the sentencing hearing both defendants sought to challenge the constitutional validity of prior convictions that were expressly "counted" for purposes of classifying them as career offenders under United States Sentencing Guidelines § 4B1.1, which requires "at least two prior felony convictions of either a crime of violence or a controlled substance offense." [1] The defendants' challenges were

---

1. Defendant Jones also challenged his conviction on the ground that it should not have been classified an adult offense for sentencing purposes. This contention is meritless, as he does not dispute that the offense qualifies as an adult offense under the literal language of the Guidelines.

brought pursuant to Guideline § 4A1.2, Application Note 6, which provides that "[c]onvictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score." Johnson's challenge, filed as an objection to his presentence report, claimed that a 1983 New York state conviction named in the presentence report resulted from an involuntary guilty plea. Jones did not submit his challenge in an objection to his presentence report, but instead objected at the sentencing hearing to one of the prior convictions in his presentence report, asserting, as had Johnson, that it resulted from an involuntary guilty plea.

At the sentencing hearing, Johnson's attorney proffered the facts of the allegedly involuntary guilty plea that led to the 1983 conviction and attempted to put Johnson on the stand to testify to the circumstances of the plea agreement. The district court refused to hear Johnson's testimony, believing that it lacked the authority to entertain a collateral challenge to the constitutionality of the prior New York state conviction. The court stated that if Johnson wanted to invalidate the New York conviction and then argue for a reduced sentence on his current federal conviction, his remedy was to first challenge the state conviction by means of any available state postconviction procedures or, if appropriate, by application to the proper federal district court for a writ of habeas corpus. If the prior conviction was ultimately invalidated by a court with authority to entertain the collateral challenge, Johnson could at that point return to the court currently sentencing him and challenge the sentence on a motion under 28 U.S.C. § 2255. In any event, the district court concluded that it lacked the present authority to hear Johnson's constitutional challenge to the prior conviction and on that ground declined to hear Johnson's testimony. It later refused to hear Jones' challenge on the same ground.[2]

### A

The district court erred in thinking it lacked the power to entertain Johnson's and Jones' challenge. The court's error lay in its perception that its *jurisdiction* to hear the challenges turned on satisfaction of the same prerequisites that apply to a habeas corpus application under 28 U.S.C. § 2254. It is true that, at first blush, the sentencing challenge procedure authorized by Guideline § 4A1.2, Application Note 6 bears a superficial resemblance to § 2254, for both procedures involve federal court inquiry into the validity of a prior state conviction. But the similarity extends no further.

In habeas corpus, the federal court may actually invalidate a state conviction and order the petitioner's release from state custody. In light of this extraordinary power, federal habeas review of state criminal cases is significantly circumscribed by the complex body of rules and doctrines that protect, among other things, values of comity and finality in our federal system. Most critical, of course, is the very structure of the habeas proceeding in which the affected state, through its prisoner's custodian, is effectively a party to the proceeding, hence able to defend its conviction against constitutional challenge. Incident to this is the further requirement imposed by the exhaustion requirement, *see* 28

---

**2.** The record indicates that Johnson would probably have had an alternative forum in which to challenge the prior conviction he sought to attack. According to his presentence report, he is in custody on the 1983 New York state conviction, inasmuch as he has absconded from New York parole for that conviction, and a parole violation warrant is outstanding. *See Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). Jones, on the other hand, apparently would not have had another forum in which to challenge the 1978 conviction used as part of his career offender calculation. His presentence report indicates that, although he is

in custody on a separate 1981 state conviction by virtue of a detainer lodged by New York, he has been released from custody and parole has lapsed on the 1978 conviction he sought to challenge. He is not "in custody" on the 1978 conviction merely by virtue of the fact that it is being used to enhance his present sentence. *See Maleng v. Cook*, — U.S. —, 109 S.Ct. 1923, 1926, 104 L.Ed.2d 540 (1989) (per curiam). This distinction between the defendants' status, however, is immaterial in light of our resolution below of the issue of the district court's authority to entertain their challenges.

U.S.C. § 2254(b), that the state shall first have had an opportunity to defend against the challenge in its own courts.

In federal sentencing hearings, however, the exercise of federal judicial power as exemplified in its party structure is of an altogether different character. Involving only the United States and a federal defendant, it is limited to the federal court's meting out an appropriate sentence for violation of a *federal* crime. To consider prior state convictions in making that determination involves no assertion of federal jurisdiction over a state criminal case, as occurs in a habeas corpus proceeding. The exercise of the federal judicial power to sentence in federal criminal cases raises questions not of federal jurisdiction but only of the proper exercise of the sentencing court's discretion and the permissible breadth of the sentencing court's inquiry.[3]

Congress has given clear directives on those questions. The sentencing court's discretion is guided by the Sentencing Guidelines. *See* 18 U.S.C. § 3553(b) ("The court shall impose a sentence of the kind, and within the range" of the Sentencing Guidelines, unless the peculiar circumstances of the case warrant a departure from the Guidelines). Exercising discretion under the Guidelines, the court's power to consider relevant information is unlimited. 18 U.S.C. § 3661 provides:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

One type of information thought to be critical to accurate, uniform, and proportional sentencing is criminal history. *See* United States Sentencing Guidelines, Chapter Four, Part A "Criminal History," Introductory Commentary ("A defendant's record of past criminal conduct is directly relevant" to the aims of sentencing.).[4] Hence, the Guidelines direct a sentencing court to take account of prior convictions—including prior state convictions—to structure the use of a defendant's criminal history in sentencing. The critical question becomes one of Guidelines interpretation: How have the Guidelines structured the inquiry into criminal history? As explained more fully below, the general approach is that a court may "count" or assign points to certain prior convictions; other convictions may not be formally counted, but may be used as the basis for an upward departure when they reliably indicate past criminal activity. The district court in this case "counted" Johnson's and Jones' prior convictions, instead of using them as the basis for upward departures. We are thus confronted with a clearly presented, albeit unusually difficult, question of Guidelines interpretation: whether the Guidelines require the sentencing court to inquire into the validity of a challenged prior state conviction before formally "counting" that conviction in the computation of a defendant's Criminal History Score or Career Offender status under Guidelines §§ 4A1.1, 4A1.2, and 4B1.1.

### B

Some further explication of the use of a defendant's criminal history under the Sentencing Guidelines is necessary to understand the narrow Guidelines interpretation issue presented. Under the Guidelines, a defendant's "Criminal History Score" or

---

**3.** The dissent persists in framing the issue throughout as being whether federal sentencing courts have power actually to *invalidate* prior state convictions. *See, e.g.,* Op. at 478 ("[T]he majority now bestows on federal courts, in the name of discretion, a free-wheeling power to invalidate prior criminal convictions."). That is *not* the issue, but a straw man. If it were the issue, we would agree, though in much shorter order, that a negative answer is compelled by the Guideline text itself, without any need to roll out the heavy artillery of federalism, separa-

tion of powers, and finality which the dissent brings to bear upon its non-issue.

**4.** The dissent would nonetheless read § 3661 as permitting consideration of factors relating only to the "person" of the defendant, as opposed to the defendant's past criminal conduct. *See* Op. at 474. This metaphysical distinction is nowhere to be found in the language of the statute, which refers expressly to a defendant's "conduct," nor in the Guidelines themselves, which place critical reliance on criminal history.

status as a "Career Offender" determines his criminal history category, which, in turn, when plotted against the proper offense level, yields an applicable sentencing range. Section 4A1.1 of the Sentencing Guidelines governs the calculation of a defendant's criminal history score, and § 4B1.1 defines career offender. Section 4A1.2 sets forth specific definitions and instructions applicable to the determinations made under §§ 4A1.1 and 4B1.1. *See* § 4B1.2 Commentary, Application note 4. The definitions and instructions in § 4A1.2 detail which criminal sentences and convictions may be "counted" in the Criminal History Score or the Career Offender designation. For instance, § 4A1.2(h) directs the sentencing court not to count "[s]entences resulting from foreign convictions," and § 4A1.2(j) excludes from the calculation "[s]entences for expunged convictions." Those same subsections, however, permit a sentencing court to use the uncounted convictions as a basis for an upward departure in sentencing under § 4A1.3, whenever the court believes that "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct."

The Guidelines also forbid the counting of "invalid convictions," but permit their consideration in making an upward departure under § 4A1.3 if they "provide reliable evidence of past criminal activity." The Official Commentary to § 4A1.2, Application Note 6 states:

> Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Any other sentence resulting in a valid conviction [sic] is to be counted in the criminal history score. Convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score. Also, if to count an uncounseled misdemeanor conviction would result in the imposition of a sentence of imprisonment under circumstances that would violate the United

States Constitution, then such conviction shall not be counted in the criminal history score. Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity.

As noted, the district court in this case did not choose to make an upward departure under § 4A1.3, though that option would have been available if the court had found the prior convictions to be reliable evidence of past criminal activity. Had it so found, the upward departure probably would have resulted in the same sentence it imposed here. *See* § 4A1.3 (departure on ground that criminal history category underrepresented seriousness of criminal history should use as reference the otherwise applicable Guidelines sentence). Here, however, the district court formally "counted" the challenged convictions. The narrow question, then, is whether the district court misapplied § 4A1.2 by formally counting Johnson's and Jones' challenged prior convictions in the belief that it lacked the authority to entertain the challenge to their constitutional validity.

C

We have already held that § 4A1.2, Application Note 6 directs the sentencing court to entertain the precise kind of challenge that the district court in this case refused. In *United States v. Davenport,* 884 F.2d 121 (4th Cir.1989), the defendant challenged his classification as a Guidelines Career Offender on the ground that one of his prior state convictions was constitutionally invalid because he had never waived his right to a jury trial. When the defendant raised the challenge, the district court recessed the sentencing hearing and gave him four weeks to prepare his challenge to the prior conviction. At the later sentencing hearing, the court ruled against Davenport's constitutional challenge to the prior conviction and accordingly used it in determining that he would be sentenced as a career offender.[5]

---

**5.** Despite the fact that the district court in *Dav-*    *enport* heard evidence to determine, for sentenc-

We affirmed the district court's sentencing of Davenport as a career offender, holding that Davenport had not met his burden of showing that the prior conviction was constitutionally invalid. *Id.* In so holding, we nonetheless recognized that the part of § 4A1.2, Application Note 6 stating that "[c]onvictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score" authorized the court to entertain the constitutional challenge that Davenport raised and that it put the burden of proof on the challenging defendant: "This Note is applicable in determining career offender status under 4B1.1, and it is clear from the plain language that the defendant has the burden of showing that a prior conviction is constitutionally invalid." *Davenport,* 884 F.2d at 124. Other circuit courts had read § 4A1.2, Application Note 6 as we did in *Davenport. See United States v. Dickens,* 879 F.2d 410 (8th Cir.1989) (affirming district court's ruling, after an evidentiary hearing before sentencing, that the defendant had failed to carry his burden that a prior conviction used in his criminal history score was the result of an involuntary guilty plea); *United States v. Miller,* 874 F.2d 466, 469 n. 5 (7th Cir.1989) (noting, in dicta, that "[t]here may be times ... when a sentencing court will have to examine convictions to some degree if the defendant claims that the prior convictions are constitutionally invalid.").

Nonetheless, the dissent would read Application Note 6 as permitting a sentencing court to treat as invalid challenged convictions only when the state court has already invalidated the conviction. This interpretation both disregards our holding in *Davenport* and is without foundation in the language of the Guidelines. The first sentence of Application Note 6 plainly instructs that previously invalidated convictions are not to be counted: "Sentences

resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted." In other words, the Guidelines already provide that convictions previously "show[n]" to be invalid, whether in state postconviction proceedings or on federal habeas corpus, may not be "counted." The separate language in the Application Note stating that "[c]onvictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score" obviously contemplates a different opportunity to "show[ ]" a prior conviction's constitutional invalidity. As we held in *Davenport,* that showing can come in the form of a challenge to a conviction not previously vacated or reversed.

Similarly, the dissent's reading nullifies the Application Note's clear directive that "if to count an uncounseled misdemeanor conviction would result in the imposition of a sentence of imprisonment under circumstances that would violate the United States Constitution, then such conviction shall not be counted in the criminal history score." The theory of the dissent appears to be that it would be an impermissible expansion of federal judicial power for the sentencing court to determine that *any* state conviction—even one shown on its face to have been uncounseled—was invalid to the extent it might be used to increase a federal sentence. Such an arbitrarily restrictive view of the sentencing court's power would deny the defendant his basic right, well established in the Supreme Court's cases and safeguarded in the Guidelines, not to suffer an enhanced punishment predicated on the fact of a prior constitutionally invalid conviction. *See Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967); *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).[6]

---

ing purposes, the validity of a prior conviction—a decision we affirmed—the dissent makes the curious assertion that *"Davenport* is silent on the central issue of who has the power to determine validity." Op. at 473 n. 4.

**6.** Though not an official statement of the Sentencing Commission and not legally binding, the

Sentencing Commission's publication "Questions Most Frequently Asked About the Sentencing Guidelines" provides an illuminating and persuasive interpretation of Application Note 6. In particular, it illustrates that the common sense of the Application Note is that a sentencing court must have the power to make some

## D

One might justifiably be concerned that this interpretation of the Guidelines could result in unduly protracted or delayed sentencings, inconvenient reexamination of old convictions from far-flung jurisdictions, and immobility in the criminal justice system. But the Guidelines are carefully structured to avoid these potential problems. The dissent's parade of these horribles is simply illusory in light of two critical features of the Guidelines not adequately taken into account in the dissent: the sentencing court's power to impose procedural requirements for the presentation of disputed sentencing factors and its power to make an upward departure.[7]

The Guidelines contemplate that the presentence report will serve the crucial function of addressing all information relevant to sentencing, hence obviating the need for delays or prolonged hearings. Section 6A1.1 mandates that a parole officer prepare for the court a presentence report, unless the court finds on the record that it already has sufficient information meaningfully to exercise its sentencing power. The defendant may not waive this report. The Official Commentary to § 6A1.1 emphasizes the Sentencing Commission's view that the new sentencing system's effectiveness is critically dependent on a "thorough presentence investigation ... determining the facts relevant to sentencing." Detailed information about prior convictions that may be used in sentencing should be and usually is provided in the presentence re-

port, giving the court a sufficient basis for its inquiry into the validity of the convictions.

The presentence report also serves the important function of putting the defendant on notice of any prior convictions that might be used in sentencing. A sentencing court would be free to insist that the defendant, aware of the contents of the presentence report, make a timely objection to the validity of any prior conviction in the report or else waive that objection. Section 6A1.2 expressly notes and encourages use of the district courts' authority to adopt rules to aid the orderly presentation of such challenges:

> Courts should adopt procedures to provide for the timely disclosure of the presentence report; the narrowing and resolution, where feasible, of issues in dispute in advance of the sentencing hearing; and the identification for the court of issues remaining in dispute.

In sum, while a sentencing court may not arbitrarily disregard a challenge to a prior conviction, nothing about our holding is meant to suggest that the court would not have broad discretion, within bounds of due process, to control the manner of the challenge's presentation.

Second, the dissent fails to appreciate the substantial flexibility afforded the sentencing court by § 4A1.3, which embodies an invitation by the Sentencing Commission to depart upward based on conduct underlying even an invalid, or arguably so, convic-

appropriate inquiry into prior convictions before "counting" them:

74. QUESTION: Are prior uncounseled convictions considered invalid convictions and therefore not countable under criminal history?

ANSWER: Not necessarily. If a conviction was constitutionally invalid, it is not counted in the criminal history score. (*See* § 4A1.2, Application Note 6.) However, the fact that a conviction was uncounseled does not automatically mean that the conviction was constitutionally invalid. In the case of a felony or misdemeanor, for example, the defendant may have waived counsel. Or, in the case of a misdemeanor, a term of imprisonment may not have been imposed and thus provision of counsel would not have been constitutionally required.

Appellate courts have held that evidence of a standard practice or customary procedure in a particular jurisdiction can be used to establish the probable constitutional validity of a prior conviction. Courts have also held that the defendant must carry the burden of establishing the invalidity of a prior conviction when the government demonstrates habit and custom that meet constitutional standards. (*See, e.g. United States v. Dickens,* 879 F.2d 410 (8th Cir.1989); *United States v. Davenport,* 884 F.2d 121 (4th Cir.1989).)

7. The concern about consideration of old convictions is also mitigated by § 4A1.2(e), which forbids counting all fifteen-year-old sentences, and ten-year-old sentences of less than one year imprisonment.

tion. The practical effect of the challenge permitted in § 4A1.2, Application Note 6 is qualified by the last sentence of the Application Note: "Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity." Section 4A1.3 is carefully tailored to avoid the incongruity of requiring a court to ignore a defendant's serious criminal past because of the fortuity that he might be able to keep certain prior convictions from being "counted." Towards that end, § 4A1.3 invites departure "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." Such departures have regularly been upheld by the courts of appeals. *See, e.g., United States v. Sturgis,* 869 F.2d 54 (2d Cir.1989); *United States v. Geiger,* 891 F.2d 512 (5th Cir.1989); *United States v. Belanger,* 892 F.2d 473 (6th Cir.1989); *United States v. Dorsey,* 888 F.2d 79 (11th Cir.1989).

Furthermore, a departure under this provision will often result in the same sentence that would have been imposed had the invalid conviction been counted. If the court is satisfied that the criminal history score "significantly under-represents the seriousness of the defendant's criminal history, and that the seriousness of the defendant's criminal history most closely resembles" that of defendants in the higher category that would have resulted from counting the invalid conviction, then that higher category should guide the court's discretion in setting the sentence. The only effect of using § 4A1.3 is to require some separate inquiry into the conduct underlying the prior conviction, beyond its automatic counting, but there is no reason to think that such an inquiry would necessitate anything more than an examination of the presentence report. Like the Seventh Circuit, "[w]e anticipate that it will become usual practice to include in presentence reports sufficient detail about prior criminal conduct, including that not resulting in conviction, in order to assist the court in determining 'the variations in the seriousness of criminal history that may occur.'" *United States v. Miller,* 874 F.2d 466, 469 (7th Cir.1989) (quoting Guidelines § 4A1.3, commentary at 4.10).

The distinction between the impermissible counting of an invalid prior conviction and the permissible use of the conduct underlying that conviction in an upward departure is consistent with the Supreme Court's decision in *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). In that case, the Supreme Court ordered a remand for resentencing where the district judge had given explicit attention in sentencing to three prior convictions later invalidated by *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Court ordered the remand because the sentence had not been "imposed in the informed discretion of [the] trial judge, but [was] founded at least in part upon misinformation of a constitutional magnitude." *Tucker,* 404 U.S. at 447, 92 S.Ct. at 591–92. The Court, however, emphasized that the judge would have been well within his discretion in considering the conduct that underlay the previous convictions: "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Id.* at 446, 92 S.Ct. at 591 (citations omitted). Indeed, the dissent in *Tucker* did not take issue with the majority's exposition of sentencing law, but only with its conclusion that the fact of the prior conviction was material to the sentence. *Id.* at 449–50, 92 S.Ct. at 592–93. The dissent noted that the judge would almost certainly impose the same sentence on remand, a possibility that the majority acknowledged would be a wholly permissible exercise of discretion. *Id.* at 452, 92 S.Ct. at 594. In other words, *Tucker* rested squarely on the distinction between the impermissible mechanical counting of the fact of an unconstitutional conviction and the permissible consideration of that conviction's reliable evidence of prior criminal activity.

In permitting the sentencing court to treat as invalid some prior convictions and

so not to "count" them in the criminal history score, the Sentencing Commission has not, as the dissent charges, sought to expand the courts' jurisdiction; it has not even broadened the traditional scope of the permissible sentencing considerations. *See Tucker*, 404 U.S. at 447, 92 S.Ct. at 591. Indeed, the Sentencing Commission acted well within its congressional authorization when it directed courts to inquire into the validity of prior convictions. As noted, Congress has expressly provided that *for purposes of federal sentencing* there is no statutory limitation on the breadth of the sentencing court's inquiry:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661; *see* Guideline § 1B1.4. The congressional formulation of 18 U.S.C. § 3661 simply reflects the *Tucker* Court's recognition of the importance of fully informed sentencing. One potentially critical piece of information, as *Tucker* recognized, is whether the defendant had previously been validly convicted. But, as 18 U.S.C. § 3661 dictates, the conclusion that the defendant's prior conviction was not a *valid* one does not disable a court from considering other relevant information concerning the prior conviction.

Section 4A1.2 is a perfect example of the Sentencing Commission's attempt to guide the sentencing court's discretion in evaluating prior convictions, one type of information in the universe of potentially relevant sentencing factors. In essence, § 4A1.2 merely formalizes what was once a more informal, probably often unarticulated, judicial reliance on prior convictions. As examination of the interaction between Guidelines §§ 4A1.2 and 4A1.3 shows, reliance on—by formal counting—a valid prior conviction is permissible without further inquiry; when a procedurally proper challenge to a prior conviction is made, however, the court must either satisfy itself of the conviction's validity or use it in an upward departure if circumstances so warrant. Put another way, those Guidelines sections have neither limited nor expanded the reach of the sentencing court's traditional and statutory power to consider prior convictions, but have instead simply required a more rigorous, and honest, exercise of that power—they provide the "guidelines" whereby the sentencing court can assure itself of "informed discretion" and avoid the possibility of sentencing based "upon misinformation of a constitutional magnitude." *Tucker*, 404 U.S. at 447, 92 S.Ct. at 592.[8]

**E**

Read in context, § 4A1.2, Application Note 6 provides for some kind of opportunity, which can be shaped by local procedural rules, to challenge a possibly invalid prior conviction before its use in sentencing. Unlike 28 U.S.C. § 2254(b), governing habeas corpus, Application Note 6 contains no exhaustion requirement. The dissent, however, would have us read such a requirement into the language of the Guidelines. To do so in the teeth of Congress' mandate to apply the Guidelines as written would both contravene legislative intent and frustrate the careful scheme of §§ 4A1.2 and 4A1.3 and Application Note 6.

We have previously rejected the notion that a court could impose an exhaustion requirement when Congress had provided for an opportunity to challenge an allegedly invalid prior conviction before its use in sentencing. In *United States v. Scarborough*, 777 F.2d 175 (4th Cir.1985), the defendant was to be sentenced under the now-repealed "Dangerous Special Offender" statute, 18 U.S.C. § 3575, which permitted enhanced sentences for certain repeat offenders, but provided the defendant an

---

**8.** Contrary to the dissent's rhetorical assertion that we have "sanction[ed] a limitless, standardless, subjective inquiry into a defendant's background," Op. at 477, we take as our basic premise that the Guidelines have significantly constrained the sentencing court's discretion. The issue, as the dissent refuses to recognize in its zeal to rhapsodize on larger themes, is not whether, but how, that discretion has been constrained in the Guidelines.

opportunity to challenge any prior conviction relied on in the sentence enhancement. Under 18 U.S.C. § 3575(e), "[a] conviction shown on direct or collateral review or at the sentencing hearing to be invalid" was to be disregarded in determining whether the defendant was subject to the enhanced sentence. In *Scarborough,* the defendant had attempted to show at the sentencing hearing that one of his prior convictions was invalid because it rested on evidence gained in an unlawful search and because there had been insufficient evidence to support the conviction. We held that the district court erred in refusing even to hear the challenge on the ground that the conviction could still be attacked in habeas corpus proceedings. Specifically, we noted that the statute "clearly contemplate[d] some sort of review of the validity of a prior conviction," *id.* at 181, and that it permitted such a challenge to be brought "at the hearing." Like the old Dangerous Special Offender statute, Application Note 6 contemplates some opportunity to "show" the invalidity of a prior conviction—whether state procedures have been exhausted or not—through means other than habeas corpus. As noted, to read that provision otherwise simply disregards its telling first sentence, which already forbids counting of reversed or vacated convictions.

It is true that we have in the past found it appropriate to impose an exhaustion requirement where to do so would not frustrate the legislative intent of a sentencing scheme. Specifically, we have imposed an exhaustion requirement on a motion under 28 U.S.C. § 2255 when the petitioner seeks to use the motion as a vehicle to attack state convictions. In *United States v. Gaylor,* 828 F.2d 253 (4th Cir.1987), we refused to permit a petitioner to bring in a § 2255 motion an unexhausted challenge to a state conviction after he had foregone his clear opportunity to raise that challenge at his Dangerous Special Offender hearing. Although we noted that no exhaustion requirement had been codified in § 2255, we found the judicial imposition of such a requirement necessary to safeguard comity concerns. *Id.* at 255. *See also Brown v.*

*United States,* 483 F.2d 116 (4th Cir.1973) (judicial imposition of exhaustion requirement on § 2255 motion claiming that uncounseled state convictions had been used as sentencing factor). We emphasized in *Gaylor,* however, that where Congress has evinced an intent that exhaustion should not be required before the challenge could be brought, as in the Dangerous Special Offender hearing, Congress' disregard of exhaustion must be respected. *Id.* at 256. We found in *Gaylor* and *Brown* that § 2255 evinced no such congressional intent to permit foregoing exhaustion and accordingly we required exhaustion in that context to protect comity values.

Here, we deal with a situation, as in *Scarborough,* where Congress has directed courts to examine the prior convictions as an incident to using them in sentencing. Congress' clear intent to establish through the Sentencing Guidelines a scheme for accurate, uniform, and proportional sentencing, evident in the language of Application Note 6 and the interaction between §§ 4A1.2 and 4A1.3, has overridden whatever comity concerns might otherwise be present when using state convictions as evidence of criminal history in federal sentencing for federal crimes. As in *Scarborough,* a judicially-created exhaustion requirement in this context would contravene the legislative intent to resolve disputed sentencing factors at the time of sentencing, a concern not present in *Gaylor* and *Brown.*

F

The conclusion we reach might nevertheless give us pause if the sentencing court's determination that a prior state conviction could not be "counted" under the Guidelines would effectively invalidate the state conviction before exhaustion of state remedies. But, of course, it would not. It is important in analyzing the nature of the defendant's challenge under the sentencing procedure here in issue to emphasize again its narrowness and limited consequences. The issue it presents is a narrow one: can a prior state conviction be "counted" in a criminal history score or

career offender determination? By law, it may not be if it is then shown to be "constitutionally invalid." A negative answer would not entitle a defendant who is still in custody on the prior conviction to automatic release. He has not, as in habeas, sued his custodian for unconstitutional confinement, but has merely interposed a defensive challenge to a particular factor sought to be used against him in current sentencing for another offense. Nor would a finding of constitutional invalidity for this limited purpose have preclusive effect in a later state or federal habeas proceeding, because the defendant's custodian, hence the state, will not have been a party (unless by sought intervention) to the federal sentencing proceeding. *Cf. Hamlin v. Warren*, 664 F.2d 29 (4th Cir.1981) (exhaustion of prisoner's § 1983 claim against state officials required where same claim against same defendants would entitle successful prisoner-plaintiff to release from custody if claim had been brought as habeas petition).

### G

Finally, the dissent's claim that to read the Guidelines as we do here—and as we already have in *Davenport* —would create undue burdens on sentencing courts is misconceived. First, as noted, a court's ability to adopt procedures to hear such challenges and to make upward departures can substantially facilitate the proper (and constitutional) consideration of prior convictions. Second, to require exhaustion, apart from disregarding the language of the Guidelines, would create a set of burdens on the state and federal court systems that the dissent does not acknowledge. Take a simple case of an uncounseled prior conviction sought to be used to increase the criminal history score of a federal defendant. While the sentencing court might have to resolve other much more difficult disputed sentencing factors, it would be forbidden from considering the validity of the prior conviction at the sentencing hearing.

Then, even where the invalidity of the prior conviction was apparent to the federal court, the defendant would have to litigate that issue in state post-conviction proceedings and, if necessary, on federal habeas corpus under § 2254. Finally, the defendant would then have to reengage the federal sentencing court, at some time likely to be far removed from the initial sentencing hearing, on a § 2255 motion. The point is clear enough: even in the simplest of cases, the dissent's litigious approach would mandate at least one set of state proceedings and at least one extra round of federal review.[9] Such an untoward result might have to be tolerated if comity concerns so dictated. But those concerns are not actually present here, as the court's determination has no effect beyond the federal sentencing itself, *cf. Hamlin v. Warren*, and, more critically, because Congress has determined that they shall not control the federal sentencing process, *cf. Scarborough*.

### VIII

For the reasons stated in Parts I–VI, we affirm the district court's judgments of conviction. For the reasons stated in Part VII, however, we vacate the sentences imposed by the court and remand for resentencing not inconsistent with this opinion. On remand, the district court should first determine whether the defendants' challenges were properly presented under the court's procedures. If so, the court should give the defendants such opportunity to present evidence concerning the prior convictions as the court deems necessary to a meaningful exercise of its sentencing authority. *See* Guideline § 6A1.1. Only if the court then finds that the defendants have failed to meet their *Davenport* burden of showing the invalidity of the challenged prior convictions may it count the convictions for purposes of criminal history score or career offender status. If the defendants do carry their *Davenport* bur-

---

**9.** The dissent's dire prediction that our holding will lead to "an avalanche of hearings" contesting prior convictions, Op. at 481, bespeaks the odd assumption that defendants whose sentences have been substantially enhanced by ar-

guably invalid convictions would not, if the sentencing court does not hear them, bring about an even greater "avalanche" of state postconviction proceedings, § 2254 petitions, and—finally —§ 2255 motions.

den, the court may nonetheless consider making an upward departure under § 4A1.3 if it finds that the defendants' prior convictions provide reliable evidence of past criminal activity.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

The majority holds that the Sentencing Guidelines confer upon federal sentencing courts the power to entertain challenges to the constitutionality of prior state convictions that may be used to enhance a federal sentence. This ruling marks an extraordinary expansion of federal judicial power to invalidate state convictions. The decision is ruinous both to federalism and finality, as it opens up yet another channel for criminal defendants to attack the validity of state convictions without even requiring exhaustion of state remedies. Because I believe that federal law, properly construed, requires a federal sentencing court to respect state convictions which the federal defendant has been given a full and fair opportunity to litigate, I dissent.[1]

## I.

The imposition the majority's holding places on our federal system, the new burden it visits on the federal judiciary, and the severe threat it poses to the finality of convictions can best be appreciated by considering just how frequently the federal judicial power announced by the majority will be invoked by criminal defendants being sentenced pursuant to the Sentencing Guidelines. As examination of the Guidelines makes clear, the majority's holding will allow almost every federal defendant with prior convictions to bring unrestricted attacks on those prior convictions at the federal sentencing stage.

Under the Sentencing Guidelines, a defendant's criminal history category is a primary factor in the determination of his sentencing range; the higher the category,

the greater the sentence he receives. *See* U.S.S.G. Ch. 5 Pt. A (Sentencing Table). Section 4A1.1 computes a defendant's criminal history category by assigning points on the basis of length of sentence for certain types of prior convictions. For example, a prior conviction that resulted in a custody sentence of more than 13 months counts 3 points, while a prior sentence of at least sixty days (but less than 13 months) counts two points. *Id.* at § 4A1.1(a) & (b). The sum of the points correlates, in turn, to a particular criminal history category. *Id.* at Ch. 5 Pt. A. By comparison, under § 4B1.1 career offenders like Jones and Johnson—defined as defendants at least 18 years of age who are convicted of certain serious felonies and who have at least two serious prior felony convictions—are automatically assigned to the highest criminal history category.

No matter which method is used to determine a defendant's criminal history category, placement in a particular category is always based on prior convictions. Because the criminal history category is an important variable in every sentencing determination under the Guidelines, the federal judicial power recognized by the majority to review and invalidate underlying prior convictions can be invoked by virtually every federal defendant with a criminal record. And given the relatively low cost and the potentially high return of such a collateral attack, every criminal defendant can now be expected to bring one.

In this new round of collateral review, the defendant will always be represented by counsel. Because such representation is not afforded as a matter of right under 28 U.S.C. § 2254, federal sentencing hearings may now be viewed as the preferred arena for plenary review of prior state convictions. Every criminal conviction in the country—state and federal, exhausted and unexhausted, old and new—recognized in Chapter 4 of the Guidelines as a potential basis for sentence enhancement will

---

**1.** I dissent from the majority's holding in Section VII regarding the Sentencing Guidelines. I

concur in Sections I–VI of its opinion.

now be open to a novel form of collateral challenge by recidivist federal offenders.

The majority attempts to soft-pedal the significance of its holding by asserting that the power to invalidate a state conviction for federal sentencing purposes is a mere adjunct to the sentencing function that will not involve release of a prisoner from custody and that will have no preclusive effect in the state that rendered the "invalid" conviction. It insists that the authority to invalidate convictions will not disrupt the sentencing process, for sentencing courts can fashion procedures to hear challenges to prior convictions and will maintain substantial flexibility to make upward departures. I regard such assurances as nothing but sheep's clothing: This decision distorts the will of Congress, undermines the philosophy of the Sentencing Guidelines, disregards much of the Supreme Court's habeas corpus jurisprudence of the last two decades, imposes substantial new burdens upon probation officers, federal prosecutors, and district judges, and dramatically reorders the relationship between state and federal courts.

## II.

The federal judicial power claimed by the majority is extraordinarily broad, exceeding in many ways the authority of federal courts in habeas jurisdiction, 28 U.S.C. § 2254. A federal habeas court's power to invalidate state convictions is explicitly provided for in a comprehensive statutory scheme, and is carefully circumscribed by rules that take into account the strong countervailing concerns of federalism, *see, e.g.,* 28 U.S.C. § 2254(b) (exhaustion requirement), and finality, *see, e.g.,* Rule 9(a) governing § 2254 proceedings (addressing delayed petitions). In contrast, the judicial power discovered today derives from one

sentence in the Guidelines Commentary, accords no respect to state judicial processes, and is practically unbounded by time.

## A.

The majority lacks authority for the power that it claims. Federal courts cannot exercise adjudicatory authority unless Congress affirmatively confers on them the right to do so. *Bender v. Williamsport Area School District,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). The presumption against federal jurisdiction, *see Dracos v. Hellenic Lines, Ltd.,* 762 F.2d 348, 350 (4th Cir.1985), which is grounded in separation of powers concerns, is even more compelling when the jurisdiction in question involves the power to invalidate state judgments, for in such a situation principles of federalism are also implicated.

Congress has seen fit to grant federal courts the authority to adjudge the validity of state judgments in two instances: 28 U.S.C. § 1257 provides for Supreme Court review of certain final state judgments, and 28 U.S.C. § 2254 provides federal habeas review for state prisoners. Accordingly, "except in a habeas corpus case [under 28 U.S.C. § 2254], no federal court other than the Supreme Court [under 28 U.S.C. § 1257] has jurisdiction to review the decision of a state court." *Lynk v. LaPorte Superior Ct. No. 2,* 789 F.2d 554, 563 (7th Cir.1986).

Certainly there is no such jurisdiction here. The purported source of jurisdiction—Application Note 6 in the Commentary to § 4A1.2 of the Sentencing Guidelines—provides that "[c]onvictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score."[2] The Note is

---

**2.** Application Note 6 reads in full:

*Invalid Convictions.* Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Any other sentence resulting in a valid conviction is to be counted in the criminal history score. Convictions which the defendant shows to have been constitutionally invalid may not be

counted in the criminal history score. Also, if to count an uncounseled misdemeanor conviction would result in the imposition of a sentence of imprisonment under circumstances that would violate the United States Constitution, then such conviction shall not be counted in the criminal history score. Nonetheless, any conviction that is not counted in the criminal history score may be considered

phrased as a limitation on the sentencing power of federal courts, not as a conferral of federal jurisdiction. It prohibits a federal sentencing court from using invalid prior convictions to enhance the length of a federal sentence, and places the burden on the defendant to "show" the convictions "to have been constitutionally invalid." The Note is utterly silent with respect to the authority to declare convictions invalid, and thus provides no basis to overcome the presumptive lack of federal jurisdiction to do so.

The majority's discovery of the power to invalidate state convictions in a single sentence in an Application Note that is silent on the issue is all the more extraordinary because the Application Note by itself lacks the force of law. The Guidelines state that the Commentary, which includes the Application Notes, should be "treated as the legal equivalent of a policy statement," U.S.S.G. § 1B1.7, "much like legislative history or other legal material that helps determine the intent of a drafter," U.S.S.G. § 1B1.7, comment. They are to be used as a way to "interpret the guideline or explain how it is to be applied." U.S.S.G. § 1B1.7. An Application Note thus has no legal significance independent of its power to illuminate a Guideline. Rather than identifying the Guideline in § 4A1.2 that Application Note 6 purports to clarify, the majority takes the Application Note itself as an independent basis for the judicial power it assumes. *See, e.g.* Op. at 461 (referring to "the sentencing challenge procedure authorized by Guideline § 4A1.2, Application Note 6"); *id.* at 28 ("§ 4A1.2 Application Note 6 provides for some kind of opportunity ... to challenge a

possibly invalid prior conviction before its use in sentencing"). The majority's interpretive legerdemain elevates Application Note 6—the legal equivalent of legislative history—to the status of a Guideline which confers an unprecedentedly broad grant of federal jurisdiction to invalidate state judgments. To describe the provenance of today's holding is to disclose its groundlessness.

The proper place to begin is not with the Commentary to the Guidelines, but rather with the Guidelines themselves. Section 4A1.2(j) of the Guidelines explicitly speaks to the use of invalid convictions. It states:

> Sentences for expunged convictions are not counted, but may be considered under § 4A1.3 (Adequacy of Criminal History Category).

As the past tense adjective "expunged" indicates, § 4A1.2(j) prohibits a sentencing court from counting convictions that have been invalidated prior to their use as sentencing factors. *See, e.g., United States v. Schweihs,* 733 F.Supp. 1174, 1176–77 (N.D. Ill.1990) ("expunged conviction" in § 4A1.2(j) is "a conviction that has been reversed").

In view of the fact that the Sentencing Commission specifically stated in § 4A1.2(j) of the Guidelines that already-expunged convictions must not be counted in the Criminal History Score, it is impossible to believe that the Commission would relegate to a single sentence in an Application Note the much more extraordinary authority to invalidate state convictions.[3] Using the Application Notes to "explain" and "interpret" *the Guidelines, see* U.S.S.G. § 1B1.7,

---

pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity.
U.S.S.G. § 4A1.2, comment. (n. 6).

**3.** Indeed, it is unclear whether the Sentencing Commission even possesses the authority to bestow this power on federal sentencing courts. *See* 28 U.S.C. §§ 991, 995 (Sentencing Commission's purposes and powers); *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 654–58, 102 L.Ed.2d 714 (1989) (discussing Congress' limited delegation of authority to the Sentencing Commission). Moreover, if the Congress were to delegate the authority to confer such jurisdiction to the Commission, the delegation might

raise non-delegation and separation of powers concerns not addressed in *Mistretta.* Thus, the majority's holding, which derives from an extremely tenuous textual foundation, is even more questionable because it raises constitutional difficulties in derogation of the Supreme Court's admonition that statutes should be interpreted to avoid such difficulties when reasonably possible. *See, e.g., Coit Independence Joint Venture .v. Federal Savings & Loan Ins. Corp.,* 489 U.S. 561, 109 S.Ct 1361, 1371, 103 L.Ed.2d 602 (1989); *Commodity Futures Trade Comm'n v. Schor,* 478 U.S. 833, 841, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986).

it is clear that Application Note 6 is nothing more than a gloss on § 4A1.2(j)'s prohibition against counting already-expunged convictions. The first sentence of Application Note 6 elaborates the meaning of § 4A1.2(j):

> Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted.

The contested sentence in Application Note 6, which prohibits the counting of convictions that "the defendant shows to have been constitutionally invalid," merely adds that the criminal defendant has the burden of "showing" the fact of the conviction's invalidity.[4] The elevation of the rather innocuous assertion that the defendant has the burden of verifying that a conviction has been invalidated into an unprecedented grant of federal jurisdictional authority is indefensible.

### B.

The majority attempts to skirt the dearth of jurisdictional authority for its holding by insisting that a federal sentencing court's power to inquire into and invalidate state convictions "raises questions not of federal jurisdiction but only of the proper exercise of the sentencing court's discretion and the permissible breadth of the sentencing court's inquiry." Op. at 462. The majority consults a rather eclectic band of sources in support of its claim. None of the grounds it offers, however, is convincing.

Certainly 18 U.S.C. § 3661 does not confer the authority to invalidate convictions. Section 3661 states:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

Section 3661 is incorporated with modifications in the Guidelines at § 1B1.4:

> In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.

The majority interprets these provisions to provide "that for purposes of federal sentencing there is no statutory limitation on the breadth of the sentencing court's inquiry." Op. at 467. Within this "limitless" range of inquiry the majority finds the authority to invalidate convictions.

This authority exceeds even the majority's own expansive reading of § 3661 and § 1B1.4. Assuming, *arguendo*, the correctness of the majority's interpretation of these provisions to permit a federal court to go behind and invalidate state convictions in the interest of ascertaining information about the defendant's background, character and conduct, its holding still does not follow. The majority's rule gives federal courts blanket authority to inquire into the validity of state convictions *regardless of whether the purportedly invalid convictions disclose anything about the defendant's person.* However, numerous bases for invalidating a conviction reveal nothing about the defendant's conduct, background, or character—for example, Fourth Amendment violations, *see, e.g., Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (excluding evi-

---

**4.** We recognized this point in *United States v. Davenport,* 884 F.2d 121, 124 (4th Cir.1989), where we stated that "[i]t is clear from the plain language [of Application Note 6] that the defendant has the burden of showing that a prior conviction is constitutionally invalid." The majority maintains, based on this single sentence, that *Davenport* held that Application Note 6 authorizes federal sentencing courts to invalidate state convictions. The elaborate reasoning the majority engages in today in an attempt to answer the "unusually difficult" question whether "the Guidelines require the sentencing court to inquire into the validity of a challenged prior state conviction," Op. at 16, belies its assertion that such a question was addressed and answered by the single quoted sentence in *Davenport.* The *Davenport* sentence concerns only the burden of proof for showing that a conviction has been invalidated. Like Application Note 6, *Davenport* is silent on the central issue of who has the power to determine invalidity.

dence obtained during search without probable cause), jurisdictional defects, *see, e.g., Gomez v. United States,* —— U.S. ——, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (conviction reversed because federal magistrate lacked jurisdiction to conduct jury selection), violations of the attorney-client privilege, *see, e.g., United States v. White,* 887 F.2d 267 (D.C.Cir.1989) (conviction reversed because evidence admitted in violation of attorney-client privilege), lack of proper venue, *see, e.g., United States v. Blecker,* 657 F.2d 629 (4th Cir.1981) (government's failure to prove venue was reversible error), a defective indictment, *see, e.g., United States v. Haga,* 821 F.2d 1036 (5th Cir. 1987) (variance between charges in indictment and basis of defendant's conviction warrants reversal), and a reliable confession obtained without adequate assurances of voluntariness, *see, e.g., Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Other bases for invalidation of a conviction—for example, confrontation clause violations, the prosecutor's failure to disclose potentially exculpatory evidence, judicial or prosecutorial misconduct before the jury, vindictive or selective prosecution, and jury contamination by extraneous influence—might or might not speak to the defendant's character depending on the circumstances of each case. Although the logic of the majority's rationale requires close attention to these distinctions, the majority is oblivious to them in recognizing an unqualified power to invalidate state convictions for purposes of federal sentencing. Thus, even the majority's expansive reading of 18 U.S.C. § 3661 and U.S.S.G. § 1B1.4—which ties, and thus limits, the power to invalidate convictions to the power to inquire into the defendant's

character—does not justify the exercise of judicial power asserted in its holding.

In any event, neither 18 U.S.C. § 3661 nor its embodiment in U.S.S.G. § 1B1.4 can support anything approaching this expansive reading. By their own terms, § 3661 and § 1B1.4 simply allow sentencing courts to consider information "concerning the *background, character,* and *conduct* " of a criminal defendant (emphasis added). They permit courts to consider information about the defendant's *person* that may be relevant to sentencing.[5] The majority mentions not a single case in which a court relies on U.S.S.G. § 1B1.4 or 18 U.S.C. § 3661 (or § 3661's predecessor, 18 U.S.C. § 3577) to inquire into and invalidate a prior state conviction. And with good reason: It is a far leap from the rather commonplace assertion that a sentencing court may consider information about a defendant's character and background to the position that it may review, *ab initio* and without specific authorization, the validity of a conviction rendered by a forum which was much more fully and intimately connected with it. The court's authority to learn as much as possible about the defendant's character can no more be used as a basis to *inquire into and invalidate* a presumptively valid prior conviction than it can be used to *inquire into and validate* a previously reversed conviction that the sentencing court believes was erroneously overturned. Under the Guidelines the sentencing court must receive and consider the fact of a felony conviction—valid or expunged—as it is presented. The authority under 18 U.S.C. § 3661 and U.S.S.G. § 1B1.4 to consider for sentencing purposes information concerning the defendant's character simply does not add up to the quite different authority needed to in-

---

5. The legislative history of § 3661 confirms this reading. It reveals that § 3661 was designed to implement the rule announced in *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). *See* H.R. No. 1549, 91 Cong., 2d Sess. 63, *reprinted in* 1970 U.S.Code Cong. and Admin.News 4007, 4040. *See also United States v. Baylin,* 696 F.2d 1030, 1038–39 (3d Cir.1982) (identical predecessor of § 3661 codified the *Williams* holding). *Williams* held that a sentencing court could consider as legitimate sentencing factors prior crimes for which the de-

fendant had not been convicted. *Williams* was predicated on the belief that "[h]ighly relevant—if not essential—to [the sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's *life and characteristics.*" 337 U.S. at 247, 69 S.Ct. at 1083 (emphasis added); *see also id.* at 249, 69 S.Ct. at 1084 ("careful study of the *lives and personalities* of convicted offenders" needed to ensure appropriate punishment).

validate a state conviction, and the majority's derivation of the latter from the former is wholly unwarranted.

Equally unavailing is the majority's attempt to locate the source of its authority in *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). In *Tucker*, the defendant brought a habeas suit under 28 U.S.C. § 2255 attacking the length of his federal sentence that had been enhanced pursuant to state convictions that were declared invalid prior to the § 2255 proceeding. 404 U.S. at 445 & n. 2, 92 S.Ct. at 590 & n. 2. *Tucker* held that the concededly invalid state convictions could not be used to enhance the length of the federal defendant's sentence. *Tucker* never considered a federal sentencing court's authority to assess the validity of a prior state conviction used to enhance a federal sentence, and nothing in *Tucker* or any subsequent Supreme Court decision suggests that such a power exists.

The majority's attempt to glean this power from "the interaction between §§ 4A1.2 and 4A1.3" of the Sentencing Guidelines, Op. at 468, also fails. The majority makes much of the fact that "any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity." U.S.S.G. 4A1.2, comment. (n. 6). It chides the dissent for failing to appreciate the "substantial flexibility afforded the sentencing court by § 4A1.3," which it views as "an invitation by the Sentencing Commission to depart upward based on conduct underlying an invalid, or arguably so, conviction." Op. at 465–466. The majority appears to believe that because § 4A1.3 provides for consideration of conduct underlying an invalid conviction that cannot itself be counted in § 4A1.2, it also provides an antecedent power to invalidate convictions.

This is clearly wrong. First, the majority's interpretation of § 4A1.3 as an "invitation to depart" in the face of even "arguably invalid" convictions negates the very structure of the Guidelines, which prescribe presumptive ranges of punishment that may be departed from only in excep-

tional circumstances. *See* 18 U.S.C. § 3553(b); *see also* U.S.S.G. § 4A1.3, comment. (departures warranted only in the *"limited circumstances* where reliable information indicates that the criminal history category does not adequately reflect the seriousness of the criminal defendant's criminal history") (emphasis added); *Guidelines Manual*, Chap. 1, Part A, Introduction 4(b) ("Commission believes that ... [courts] will not [depart] very often"). The majority thus diminishes the significance of the Guidelines' sentencing ranges and re-injects broad discretion into a system that was designed to cabin discretion.

More importantly, the majority's focus on the fact that sentencing courts can consider under § 4A1.3 conduct underlying invalid convictions that cannot be counted under § 4A1.2 begs the central question of when, how, and by whom these convictions may be invalidated. Indeed, all of the various bases offered by the majority for today's holding—Application Note 6, "the interaction between §§ 4A1.2 and 4A1.3," 18 U.S.C. § 3661, *Tucker*, and *Davenport* —suffer from the same essential defect: Although they all relate to the prohibition against the use of invalid state convictions to enhance sentences, none speaks to the significantly different issue of federal judicial power to invalidate state convictions. Such jurisdictional authority over states can only be conferred by Congress, *see* 28 U.S.C. §§ 1257, 2254, and none has been conferred here.

### C.

In addition to the particular errors in the majority's interpretation of the Guidelines, its ruling suffers from a broader, and more portentous, flaw. This larger problem concerns the philosophy of discretionary sentencing inherent in the majority's logic, which until now I had thought was precisely the philosophy that the Sentencing Act of 1984, and the Guidelines promulgated thereunder, rejected.

In the majority's world, sentencing judges possess unlimited discretion to consider any factor about a defendant's past in order to mete out the precise sentence that

"justice" requires. Believing that the Guidelines "have [not] limited ... the reach of the sentencing court's traditional and statutory power to consider prior convictions," Op. at 467, the majority would use 18 U.S.C. § 3661 and U.S.S.G. § 1B1.4, *inter alia*, as wideranging tools to look behind the objective evidence of presumptively valid convictions in search of a more personal and detailed insight into the character of the defendant. This invariably subjective, increasingly personalized inquiry is absolutely antithetical to the purpose of the Sentencing Guidelines.

Prior to the establishment of the Guidelines, "the Federal Government employed in criminal cases a system of indeterminate sentencing." *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 650, 102 L.Ed.2d 714 (1989). Because this system presupposed that rehabilitation was the goal of sentencing, it "required the judge and the parole officer to make their respective sentencing and release decisions upon their own assessments of the offender's amenability to rehabilitation. As a result, the court and the officer were in positions to exercise, and usually did exercise, very broad discretion." *Id.* The indeterminate sentencing system suffered at least two major difficulties. First, "[r]ehabilitation as a sound penological theory came to be questioned." *Id.* at 651. Second, because the system gave almost unfettered discretion to the sentencing judge, "[s]erious disparities in sentencing ... were common." *Id.*

Dissatisfaction with these and other flaws led Congress to pass the Sentencing Reform Act of 1984. The Act rejected the "outmoded rehabilitation model" at the heart of the indeterminate sentencing system and established a Sentencing Commission to institute instead a "mandatory-guideline system." *Id.* at 651–52. In accordance with the congressional mandate, the guidelines were "designed to create uniform, determinate sentences based upon the crime committed, not the offender."

*United States v. Mejia–Orosco*, 867 F.2d 216, 218 (5th Cir.1989).

In addition, the Guidelines "substantially circumscribe the discretion which sentencing courts formerly exercised." *United States v. Allen*, 873 F.2d 963, 966 (6th Cir.1989). The Commission achieved this goal by translating numerous sentencing factors into categories of offense behavior and offender characteristics that, when applied to the facts of a particular crime, yield a determinate range of sentences for each class of convicted persons. Congress made the Guidelines sentencing ranges "binding on the courts," *Mistretta*, 109 S.Ct. at 652, unless a court is presented with sentencing factors not considered by the Commission:

> The court *shall* impose a sentence of the kind, and within the range, [of the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, *not adequately taken into consideration by the Sentencing Commission in formulating the guidelines* that should result in a sentence different from that described.

18 U.S.C. § 3553(b) (emphasis added). The Guidelines' utilization of a multitude of sentencing factors, combined with a court's ability to depart from Guideline ranges in unusual situations not contemplated by the Commission, ensures individualized sentencing in every case. *Allen*, 873 F.2d at 966. But if an aggravating or mitigating circumstance was adequately taken into account by the Commission, departure from the Guidelines is unwarranted. *See United States v. Summers*, 893 F.2d 63, 66 (4th Cir.1990); *United States v. Daiagi*, 892 F.2d 31, 34 (4th Cir.1989).[6]

The flaw in the majority's logic lies in its utter failure to appreciate that the Guidelines channel the inherently subjective nature of the traditional sentencing inquiry by determining in advance the relevance for sentencing purposes of many sentencing factors. The Guidelines themselves al-

---

**6.** "In determining whether a circumstance was adequately taken into consideration [by the Commission], the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. 3553(b).

ready account for most factors that pertain to sentencing, as well as the precise degree to which they are relevant. Thus, the power to learn about the defendant's character, which the majority believes to be plenary and to include the power to invalidate convictions, is circumscribed by provisions in the Guidelines that determine precisely how such personal information should be assessed and computed. At Congress' direction, *see* 28 U.S.C. § 994(d), the Guidelines list several factors—race, sex, national origin, creed, religion, and socio-economic status—that may *never* be considered as either aggravating or mitigating circumstances. U.S.S.G. § 5H1.10, p.s. Also in compliance with a clear congressional mandate, *see* 28 U.S.C. § 994(e),[7] the Guidelines provide that several other factors—age, education and vocational skills, mental and emotional conditions, physical condition (including drug and alcohol dependence), employment record, and family and community ties—are generally irrelevant except in an extraordinary case. U.S.S.G. § 5H1.1–6, p.s. These factors all concern the defendant's background, character, and conduct. Nonetheless, it is reversible error for a court to depart from a Guideline range through reassessment of these and other factors which the Commission has already taken into account and accorded determinate sentencing weight. *See, e.g., United States v. Brand,* 907 F.2d 31 (4th Cir.1990) (trial court departure based on finding of extraordinary family responsibilities erroneous and thus violative of U.S.S.G. § 5H1.6., p.s.); *United States v. Summers,* 893 F.2d at 69 (district court downward departure based on age of defendant violative of U.S.S.G. 5H1.1., p.s.).

Consistent with these explicit limitations on a court's power to inquire into the defendant's background, character and conduct, U.S.S.G. § 1B1.4 recognizes that other provisions of the Guidelines circumscribe its scope. Section § 1B1.4 states that in determining the sentence to impose within the guideline range or whether departure is warranted, the sentencing court may consider information about a defendant's background without limitation, *"unless otherwise prohibited by law"* (emphasis added). Congress' requirement in 28 U.S.C. §§ 994(d) and (e) that certain facts about a defendant's background and character must not be considered at all (or only in a very limited way), and the Commission's policy statements in U.S.S.G. § 5H reflecting the limited relevance of these factors, both constitute law that, as § 1B1.4 recognizes, prohibits the unlimited inquiry authorized by the majority.

The majority now casually dismantles this careful structure. It is obvious that the Guidelines prohibit the majority from sanctioning a limitless, standardless, subjective inquiry into a defendant's background. The power to inquire about a defendant's person is rigorously circumscribed, and certainly cannot be invoked as authority to reassess the validity of a prior conviction. Just as the Guidelines determine the relevance and weight, for sentencing purposes, of certain personal characteristics, they also speak in comprehensive detail about which prior convictions can and cannot be used as sentencing factors. *See* U.S.S.G. Chapter 4. Because the relevance and weight of a prior conviction, as well as its potential invalidity, are factors that the Guidelines thoroughly "take into consideration," a court is bound by the criminal history score generated by U.S.S.G. chapter 4, and is prohibited from performing its own personal inquiry into a conviction's validity as a basis for departing from a Guideline range. 18 U.S.C. § 3553(b).

I recognize, of course, that discretion has not been altogether eliminated under the Sentencing Guidelines, and that discretion

---

7. Title 28 U.S.C. § 994(e) states:
   The [Sentencing] Commission shall assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant.
   Furthermore, 28 U.S.C. § 994(d) states that the Commission shall take these and other personal background characteristics into account "only to the extent that they do have relevance."

still inheres in selecting the sentence within the appropriate guideline range and in determining whether or not to depart from the guideline range in unusual circumstances. To acknowledge that such discretion remains is not, however, to overlook the essential point that the Guidelines have curtailed what was once almost unfettered sentencing discretion by objectifying sentencing factors and establishing determinate sentencing parameters. In the face of this curtailment, the majority now bestows on federal courts, in the name of discretion, a free-wheeling power to invalidate prior criminal convictions. Still riding its personalized horse of justice over the sentencing plain in each individual case, the majority fails to comprehend that under the Guidelines, justice is achieved through determinate sentencing. This failure makes all the more egregious the majority's deduction of the power to invalidate convictions from the power to inquire into character.

### III.

In arrogating jurisdiction to invalidate state convictions, the majority refuses to recognize the doctrine of exhaustion of state remedies and the comity concerns that underlie it. The exhaustion doctrine predates its statutory embodiment in 28 U.S.C. § 2254(b) and "flows from the essential nature of our federal system wherein both federal and state courts are 'equally bound to guard and protect rights secured by the Constitution.'" *United States v. Gaylor*, 828 F.2d 253, 255 (4th Cir.1987) (quoting *Ex parte Royall*, 117 U.S. 241, 245, 6 S.Ct. 734, 736, 29 L.Ed. 868 (1886)). Exhaustion "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982). The doctrine recognizes that "it would be unseemly in our dual system of government for the federal courts to upset a state-court conviction without affording to the state courts the opportunity to correct a constitutional violation." *Duckworth v. Serrano*, 454 U.S. 1, 4, 102 S.Ct. 18, 20, 70 L.Ed.2d 1 (1981).

The majority disregards nonetheless the consistent admonition of this circuit that "state remedies must be exhausted before a federal forum will pass upon the validity of a prior conviction in connection with a [claim that the prior conviction illegally enhanced a federal sentence]." *Strader v. Troy*, 571 F.2d 1263, 1268 (4th Cir.1978). In *Brown v. United States*, 483 F.2d 116 (4th Cir.1973), the defendant brought a § 2255 proceeding to challenge a federal sentence that was enhanced by three allegedly invalid prior state convictions. The *Brown* court refused to entertain a collateral challenge to the state court convictions, primarily because it would circumvent the requirement to exhaust state remedies. It detailed, rather presciently, the damage visited by the majority upon orderly procedure:

> If the state conviction is in another state from that in which the 2255 proceedings are had, the State procuring the challenged conviction would not be a party to the proceeding, would not have been heard on the invalidation of its conviction, and would have been denied the right to a prior exhaustion of state remedies.... [These reasons] appear sufficient warrant for requiring that a prisoner who bases his attack against one sentence on a collateral attack on another state sentence, particularly, when imposed in a foreign jurisdiction, to attack first the underlying sentence in the court imposing that sentence.

483 F.2d at 119. *See also United States v. Gaylor*, 828 F.2d 253 (4th Cir.1987) (failure to exhaust state remedies bars a § 2255 attack on federal sentence enhanced by allegedly invalid prior state convictions). These decisions clearly prohibit a federal sentencing court from ruling on the validity of unexhausted state convictions.

Disregarding the dispositive force of *Brown* and *Gaylor*, the majority maintains that *United States v. Scarborough*, 777 F.2d 175 (4th Cir.1985), absolves it from recognizing an exhaustion requirement here. This is incorrect. The Dangerous Special Offender statute at issue in *Scarborough* instructed courts to "disregard"

prior convictions "shown on direct or collateral review *or at the [sentencing] hearing* to be invalid." 18 U.S.C. § 3575(e) (emphasis added). *Scarborough* held that because the "explicit language" of the statute contemplated a hearing in which to ascertain the validity of prior convictions, a federal court could inquire into the validity of unexhausted state convictions used to enhance sentences under the DSO statute. *Id.* As we stated in *Gaylor*, "*Scarborough* recognized a limited waiver of the usual rule of exhaustion in the narrow and specific circumstances prescribed by Congress." *Gaylor*, 828 F.2d at 256. If anything, then, the decision teaches that unless the particular statute "clearly contemplates some sort of review of the validity of a prior conviction," *Scarborough*, 777 F.2d at 181, such review should not be recognized.

The majority contends nonetheless that this case comes within *Scarborough*'s narrow exception to the requirement to exhaust state remedies because "the language of Application Note 6 and the interaction between §§ 4A1.2 and 4A1.3" show that "Congress has directed courts to examine the prior convictions as an incident to using them in sentencing." Op. at 468. As I have demonstrated above, however, nothing in Application Note 6 or the structure of the Guidelines remotely contemplates such review. The Guidelines simply do not contain the "explicit language" that *Scarborough* requires before federal courts can disregard the constitutionally-based exhaustion requirement. Moreover, *Scarborough*'s slender exception to the exhaustion requirement was limited to the narrow class of cases under the DSO statute. By contrast, the federal judicial power assumed today may apply in every federal criminal case.

In an attempt to soften the affront to states of its decision, the majority asserts that a federal judgment invalidating a prior state conviction for purposes of federal sentencing will have no preclusive effect in subsequent state or federal habeas proceedings because the state custodian would not have been a party in the federal sentencing process. This conclusion does not follow, since the federal defendant may now use the federal sentencing court's judgment as the basis for a separate § 2254 suit against the custodian in the state which rendered the now "invalid" conviction. Moreover, the state's retention in custody of a prisoner on the basis of a conviction that a federal court has determined violates the federal constitution may, apart from all considerations of unseemliness, offend due process and require release.

The majority's explanation of the effect of its decision upon states further demonstrates its disregard for the values of federalism. These values are not implicated only when a federal court orders the release of a state prisoner. Federal court invalidation of a state conviction—even if it lacks collateral legal consequences within the state—constitutes a major affront to the integrity of the state's judicial process. As we stated in *Gaylor*:

> A challenge to the validity of a state conviction implicitly questions in at least some part the integrity of the state's judicial process. It is the state's particular interest in preserving the dignity and public respect attendant to its system of criminal justice that justifies an exhaustion of remedies requirement.... [I]t is the challenge itself and not the vehicle by which it is brought that implicates the interests of a state....

828 F.2d at 255. In addition, "[i]ndiscriminate federal intrusions may simply diminish the fervor of state judges to root out constitutional errors on their own." *Engle v. Isaac*, 456 U.S. 107, 128–29 n. 33, 102 S.Ct. 1558, 1572 n. 33, 71 L.Ed.2d 783 (1982).

The majority's insistence that "a finding of constitutional invalidity for [the limited purpose of federal sentencing would not] have preclusive effect in a later state or federal habeas proceeding," Op. at 469, misses the point. State convictions are either valid or they are invalid. They are not valid for some purposes, but invalid for others. They are not valid in the eyes of the state judiciary, but invalid in the eyes of the federal system. The method for determining their validity is singular, and it

belongs in the first instance with the states.

## IV.

This decision also strikes another blow to the finality of judgments that is essential to the proper functioning of the rule of law. *See Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 1074–75, 103 L.Ed.2d 334 (1989) (plurality opinion); *Kuhlmann v. Wilson*, 477 U.S. 436, 452–54 & n. 16, 106 S.Ct. 2616, 2627 & n. 16, 91 L.Ed.2d 364 (1986) (plurality opinion); *Engle v. Isaac*, 456 U.S. 107, 127–28, 102 S.Ct. 1558, 1571–72, 71 L.Ed.2d 783 (1982).

The resources of the federal judiciary, we are repeatedly reminded, are finite and increasingly unable to address the demands made upon them. As Johnson's case illustrates, the majority's rule will increase these demands dramatically. Johnson attempts to attack his state conviction by claiming that he entered an involuntary plea of guilty as the result of coercion by his counsel. To support this claim, Johnson wished to take the stand to testify concerning the circumstances of his plea agreement in state court, and to submit to the district court for review the official transcripts of his guilty plea hearing and subsequent hearings before the New York State Supreme Court. In response, the government may have been required to introduce testimony from Johnson's original attorney and others involved in the New York proceeding to rebut the claim of invalidity. The district court would thus have been forced, probably after a lengthy continuance, to devote a significant amount of time and effort to consider and address Johnson's collateral attack. Moreover, Johnson's case involved no more than a single-issue attack on a single underlying state conviction; the burden on federal district courts will necessarily increase as multiple state convictions are attacked for multiple infirmities.[8]

This decision will also increase the workload of federal appellate courts. First, because the majority makes upward departure under U.S.S.G. § 4A1.3 less of an exception, appellate review of such departures will necessarily increase. *See* 18 U.S.C. § 3742(a)(3) (providing for appellate review of upward departures from applicable guideline range). Second, although a sentencing court's refusal to depart from a Guidelines sentencing range is unappealable, *see United States v. Bayerle*, 898 F.2d 28, 30–31 (4th Cir.1990), its selection of the appropriate range, which turns in large part on its calculation of the criminal history score, is appealable. *See* 18 U.S.C. §§ 3742(a)(1) & (2) (sentence imposed in violation of law or as a result of an incorrect application of the guidelines is appealable). Thus, because a sentencing court is now "require[d] ... to inquire into the validity of a challenged prior state conviction before formally 'counting' that conviction in the computation of a defendant's Criminal History Score," Op. at 462, its refusal to invalidate a prior conviction may be subject to review under at least an abuse of discretion standard, and more probably— because legal issues of constitutional dimension will often be involved—under a *de novo* standard. Defendants can henceforth be expected to challenge as a matter of course the adequacy of the district court's examination of the validity of prior convictions.

The additional resources required to give meaningful review to state convictions at federal sentencing hearings will consequently cut deeply into the time and attention that federal courts can give to "civil actions, many novel and complex, which intimately affect the lives of great numbers of people" and "original criminal trials and appeals which deserve our most careful attention." *Schneckloth v. Bustamonte*, 412 U.S. 218, 260, 93 S.Ct. 2041, 2065, 36 L.Ed.2d 854 (1973) (Powell, J., concurring). It will also require United

---

**8.** In fact, the burden on the federal court system is even more extreme, for the federal sentencing court's power to invalidate convictions is not limited to the invalidation of *state* convictions. The majority's logic applies equally to a sentenc-

ing court's power to inquire into and invalidate *federal* convictions, even if these convictions have been validated through direct federal appeal and federal habeas review.

States Attorneys to expend precious prosecutorial capital to defend, at the sentencing stage of a federal conviction, state convictions rendered under substantive and procedural regimes of jurisdictions with which they are unfamiliar. Given the already extreme burden on federal judicial and prosecutorial resources, and the presumptive validity of state convictions in our federal system, *see Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983), an additional round of review for those to whom collateral recourse is already provided is worse than redundant.

Numerous procedures now exist for those in Jones's and Johnson's situation to challenge state convictions. Direct review in the state court system and to the Supreme Court, as well as state and federal habeas review, are all means by which state convictions can be attacked. The Supreme Court has frequently noted the significant costs of habeas review, not only to finality, but also to our federal structure and to society at large. *See Engle*, 456 U.S. at 127–28, 102 S.Ct. at 151–52. There is no justification for increasing these costs when the purposes served by the majority's ruling can be achieved through mechanisms already in place.

Astoundingly, the majority denounces reliance on these well-established procedures as a "litigious approach." Op. at 469. Insistence upon respect for such settled rules of direct and collateral review is certainly not more litigious than the majority's approach, which adds to the host of procedures already available a novel and undemarcated round of post-conviction attack. Moreover, the break from established procedures raises a plethora of problems all but unmentioned by the majority. Foremost are the practical difficulties of reviewing an old conviction from a foreign jurisdiction. The state of the original conviction is where "all of the material events took place" and where "the records and witnesses pertinent to" the challenge are likely to be found. *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 493–94, 93 S.Ct. 1123, 1128–29, 35 L.Ed.2d 443 (1973). As we noted in *Brown*, "it can hardly be gainsaid that a more orderly and justiciable review of the validity of a conviction can be afforded by the [original] sentencing court than by a court of a foreign jurisdiction." 483 F.2d at 119. These reviewability problems are amplified by the "erosion of memory" and "dispersion of witnesses" that invariably occur with the passage of time. *Kuhlmann v. Wilson*, 477 U.S. at 453, 106 S.Ct. at 2627. The lack of an exhaustion requirement further magnifies the difficulties, because unexhausted claims will often lack "a complete factual record to aid the federal courts in their review." *Rose v. Lundy*, 455 U.S. at 519, 102 S.Ct. at 1203–04.

The majority brushes aside all these complexities when it states that the presentence report prepared by the probation officer as required by U.S.S.G. § 6A1.1 will "obviat[e] the need for delays or prolonged hearings" because it will "giv[e] the court a sufficient basis for its inquiry into the validity of the convictions." Op. at 465. Under the majority's scheme, probation officers will be required to amass details underlying old convictions, to interview witnesses in foreign jurisdictions, and to prepare detailed analyses of those jurisdictions' procedural rules. Even assuming that probation officers could perform such duties, it is wholly unrealistic to believe that the validity of a prior conviction can thoughtfully be evaluated merely on the basis of a presentence report. For example, the underlying claims here concerning the voluntariness of guilty pleas cannot intelligently be reviewed without a detailed factual inquiry that would necessitate an evidentiary hearing. The Guidelines contemplate that a hearing "may sometimes be the only way to resolve disputed issues." U.S.S.G. § 6A1.3, comment. Since the majority views the validity of a state conviction as a disputable issue in federal sentencing, an avalanche of hearings under § 6A1.3 can be expected to follow from today's holding.

In its rush to establish yet another means for criminal defendants to challenge state convictions, the majority ignores this mass of legal and practical difficulties. At bottom, the power to invalidate state con-

victions announced by the majority is premised on nothing more than the belief that a criminal conviction cannot be reviewed too often, and that the more times it is reviewed, the more validity it possesses. This is a highly dubious notion, *see* Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.L.Rev. 441, 446–51 (1963), and in any event is one our criminal justice system can ill afford. As the late Professor Paul Bator eloquently stated:

A procedural system which permits an endless repetition of inquiry into facts and law in a vain search for ultimate certitude implies a lack of confidence about the possibilities of justice that cannot but war with the effectiveness of the underlying substantive commands.... There comes a point where a procedural system which leaves matters perpetually open no longer reflects humane concern but mere anxiety and a desire for immobility.

Bator, *supra*, at 452–53. This decision will make its own unnecessary contribution to the immobility confronting our system of criminal justice. It will make the new Sentencing Guidelines more burdensome for federal district judges and will create a new source of friction with the states. And in the name of procedural justice, it will sever the process of federal post-conviction review from the state's own process of self-review, creating a system in which federal attacks upon state convictions are endless, and endlessly disconnected.

## V.

The proper analysis in this case begins and ends with the recognition that Congress has not conferred upon the federal courts the power assumed here by the majority. The majority's approach is also disturbing because it violates the clear command of Congress that federal courts must give state court judgments "full faith and credit":

The ... judicial proceedings of any ... State, Territory, or Possession ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they

have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738.

The Full Faith and Credit statute "reflects a variety of concerns, including notions of comity, the need to prevent vexatious litigation, and a desire to conserve judicial resources." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 84, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984). It requires federal courts, in determining the subsequent effect of a state judgment in federal court, to give the state judgment the same effect as it would have in the rendering state. *Id.* at 81, 104 S.Ct. at 896. Section 1738 applies to state criminal as well as state civil judgments. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1981).

The Supreme Court has consistently held that the preclusion rules of § 1738 presumptively control unless a coordinate federal statute contains "an express or implied partial repeal" of § 1738. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982); *see also Allen*, 449 U.S. at 99, 101 S.Ct. at 417. The Court has also noted that an implied repeal is disfavored and will not be recognized unless the intent of Congress is "clear and manifest." *Kremer*, 456 U.S. at 472 n. 10, 485, 102 S.Ct. at 1892 n. 10, 1899. The primary example of a congressional exception to § 1738 "is the authorization for federal courts to reexamine state findings upon a request for a writ of habeas corpus. 28 U.S.C. § 2254." *Id.* at 485 n. 27, 102 S.Ct. at 1899 n. 27. In contrast, 42 U.S.C. § 1983, despite its underlying purpose to provide a federal cause of action in situations where state courts inadequately protect federal rights, is not an exception to the preclusion rules of § 1738, even if it is the only vehicle through which a constitutional claim can be brought to federal court. *Allen*, 449 U.S. at 97–105, 101 S.Ct. at 416–20.

The Full Faith and Credit Statute speaks directly to the question presented in this case. Nothing in the Guidelines, its Com-

mentary, or the sentencing statutes remotely suggests that Congress intended to effect a partial repeal of § 1738. This silence requires a federal sentencing court to give full faith and credit to a state conviction in which the defendant had a "full and fair opportunity," *Allen*, 449 U.S. at 101, 101 S.Ct. at 418, to litigate the issues that allegedly render the underlying state convictions invalid.

The Full Faith and Credit Statute requires federal courts to give "not some, but full credit" to state judicial proceedings. *Davis v. Davis*, 305 U.S. 32, 40, 59 S.Ct. 3, 6, 83 L.Ed. 26 (1938). The majority's holding fails to respect state judgments even to the extent that the states themselves would do so. Its suggestion that a federal court need not respect a state judgment when the state judgment is considered for purposes of federal law, *see* Op. at 461, 466, reveals an astonishing failure to appreciate the dictate of § 1738, for *Allen, Kremer,* and *Migra* all stand precisely for the proposition that a federal court must respect the factual and legal conclusions underlying a state judgment when that judgment is implicated in a federal statutory scheme. The fact that the majority places the burden on the defendant to prove the invalidity of state convictions does not overcome this deficiency, for the placement of burden gives only presumptive value to the state conviction, and presumptive value is not full faith and credit.

### VI.

The district court thus properly held that it lacked authority to entertain Jones' and Johnson's attack on their prior state convictions. The district court also correctly noted that if the defendants' state convictions are declared invalid by the state of conviction, the defendants can bring a habeas suit under 28 U.S.C. § 2255 attacking the federal sentence as illegally enhanced. This was the course required by *Brown*, and it should be followed here.

Attention to these procedures will affect the two defendants differently. Johnson is still in custody on the 1983 New York state conviction he attempted to challenge at the sentencing hearing. As his counsel conceded at the sentencing hearing, he retains the option to exhaust certain state remedies and to bring a federal habeas attack on that conviction. If successful, he can challenge his federal sentence under 28 U.S.C. § 2255. This approach pays appropriate respect to state judicial processes and to the elaborate scheme of federal and state postconviction remedies.

In contrast to Johnson, Jones is no longer "in custody" for the 1978 conviction that he challenges and thus appears to be precluded from federal habeas relief even though the prior state sentence is being used to enhance his present sentence. *See Maleng v. Cook,* —— U.S. ——, 109 S.Ct. 1923, 1926, 104 L.Ed.2d 540 (1989). The record does not reveal whether Jones obtained state or federal postconviction review. However, even assuming that Jones now lacks postconviction remedies altogether, the district court still does not possess authority to scrutinize and invalidate his state conviction.

The fact that Jones's twelve-year-old state conviction is now being used to enhance his federal sentence for another crime in no way casts doubt on the validity of the state conviction. The state conviction is similarly no less legitimate because a federal court did not review the state court's constitutional rulings. The Supreme Court has consistently rejected the notion "that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court," *Allen*, 449 U.S. at 103, 101 S.Ct. at 419, for "it is more important to give full faith and credit to state-court judgments than to ensure separate forums for federal and state claims." *Migra*, 465 U.S. at 84, 104 S.Ct. at 898. *See also Stone v. Powell,* 428 U.S. 465, 493–94 & n. 35, 96 S.Ct. 3037, 3052 & n. 35, 49 L.Ed.2d 1067 (1976). Nor is the state conviction somehow unsound because it was not challenged collaterally. The Supreme Court has made clear that

> direct appeal is the primary avenue for review of a conviction or sentence.... When the process of direct review ...

comes to an end, a presumption of finality and legality attaches to the conviction and sentence.... Federal Courts are not forums in which to relitigate state trials.

*Barefoot v. Estelle*, 463 U.S. at 887, 103 S.Ct. at 3391–92. The state trial remains the " 'main event,' " not a " 'tryout on the road' for what will later be the determinative federal ... hearing." *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977).

Jones and Johnson each had a jury trial, an appeal of right, and an opportunity for collateral review. Our criminal justice system, though generous, does not allow them to challenge the validity of their state convictions at the sentencing stage of their federal offenses. The majority has chosen the wrong time, the wrong place, and the wrong manner of federal review. The district court refused to assume the authority rightly reserved to other jurisdictions, and I would affirm its judgment.