960 F.2d 148
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Nathaniel WATKINS, a/k/a J.R., a/k/a Peanut, a/k/a Nut,
Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Sherrille Yvette GILBERT, a/k/a Mimsky, Defendant-Appellant.
 Nos. 91-5647, 91-5648.
 United States Court of Appeals,
Fourth Circuit.
 Argued: August 1, 1991
Decided: April 21, 1992
 
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 
 
 1
 ARGUED: Warren Gary Kohlman, Kohlman & Rochon, Washington, D.C., for Appellants.
 
 
 2
 Jeanne Marie Hauch, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 
 
 3
 ON BRIEF: Robert S. Powell, Powell & Colton, P.C., Alexandria, Virginia, for Appellants.AT1Henry E. Hudson, United States Attorney, William G. Otis, Assistant United States Attorney, Michael R. Smythers, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 
 OPINION
 WIDENER, Circuit Judge:
 
 4
 Nathaniel Watkins and Sherrille Yvette Gilbert appeal their convictions on various drug trafficking related charges. They argue that the district court committed reversible error by admitting statements from individuals as coconspirators without a proper showing that the individuals were connected to the conspiracy; refusing to grant various motions for mistrial; admitting evidence of threats made to Doris Kay, a government witness, and her children; allowing the government to change a word in the indictment; refusing to allow Watkins to admit into evidence the entirety of his statement to a government agent; and refusing to grant appellants' motion for a judgment of acquittal on the substantive counts because of the vagueness of the indictment.
 
 
 5
 On July 25, 1990, a thirty-two count indictment was returned against Watkins, Gilbert, and Stephen Cutia, a former Fredericksburg, Virginia police officer. The major allegation was that Watkins and Gilbert, with Cutia's (then a police officer) protection, were directing a large scale conspiracy to distribute cocaine and crack cocaine in the Fredericksburg area between the Spring of 1988 and June 1, 1990. After an eight day jury trial, Gilbert was convicted on 20[1] counts and Watkins was convicted on 21 counts. Each was sentenced to a term of life imprisonment. Cutia was not convicted on any of the charges.
 
 Coconspirator's Statements
 
 6
 Watkins and Gilbert argue that certain out-of-court statements of non-testifying witnesses were erroneously admitted, under Fed. R. Evid. 801(d)(2)(E), as those of coconspirators. The statements were to the effect that Cutia was subject to being bribed for protection and were made by both unnamed coconspirators as well as two who were named.
 
 
 7
 "[A] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is admissible. Fed. R. Evid. 801(d)(2). "There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.' " Bourjaily v. United States, 483 U.S. 171, 175 (1987). To be admissible, the court must determine that the offering party has proved these preliminary facts by a preponderance of the evidence. 483 U.S. at 175-76; cf. Fed. R. Evid. 104(a). The district court's factual finding that a statement was made by a coconspirator "during the course and in furtherance of the conspiracy" will not be disturbed on appeal unless clearly erroneous. 483 U.S. at 181.
 
 
 8
 We do not believe that the district court erred in finding these statements to have been made in the course of the conspiracy. All of the out-of-court statements were made by individuals involved in Fredericksburg drug activity. Although one Errington Brooks headed one organization and Watson and Gilbert directed another, both were involved with Cutia and some individuals distributed for both organizations. Thus there were sufficient ties to establish a single conspiracy involving the named drug dealers whose statements were admitted as those of coconspirators. While the statements of the unnamed coconspirators were patently inadmissible, even under Rule 801(d)(2), those statements were subject to a harmless error analysis as were the statements of the named coconspirators.
 
 
 9
 If there was any error it was harmless. All of the statements that the defendants complain of involve Cutia's conduct. The defendants are not mentioned in any of the statements they contend were erroneously admitted and therefore any error was harmless. See United States v. Jackson, 863 F.2d 1168, 1172 (4th Cir. 1989) (improper admission of conversations as those of a coconspirator is harmless error when the "conversations contain no evidence of any criminal activity on the part of [the defendants] and could not have influenced the jury.") The fact that Cutia was acquitted of all charges indicates that the jury was not influenced by the challenged statements.
 
 Mistrial Motions
 
 10
 Gilbert and Watkins assert that the district court abused its discretion by refusing to grant a mistrial, on the following grounds: (1) evidence of injuries suffered by a government witness was put before the jury; (2) a government witness mentioned in her testimony that Gilbert "had been to jail before"; and, (3) a government witness made improper statements about taking a polygraph test. We are of opinion the district court did not commit reversible error in refusing to grant a mistrial.
 
 
 11
 On cross-examination of defense witness, Angel Robinson, the following exchange occurred:
 
 
 12
 Government: Where is your sister Hope today?
 
 
 13
 Angel Robinson: At the Barnhill Learning Center in Richmond.
 
 
 14
 Q:What is her physical condition?
 
 
 15
 A:She was hit by a car Thursday night. She is not doing too good at this time.
 
 
 16
 Q:She is in the hospital, right?
 
 
 17
 A:Yeah.
 
 
 18
 Q:Can you describe the circumstances under which she was hit?
 
 
 19
 A:What do you mean?
 
 
 20
 Q:Do you know-
 
 
 21
 A:Where?
 
 
 22
 Q:What happened?
 
 
 23
 A:She was walking on the sidewalk, and a car came up and hit her from the front.
 
 
 24
 Q:Came up on the sidewalk and struck her?
 
 
 25
 A:Yes.
 
 
 26
 Q:Now, what did the occupants in that vehicle do, by the way, after they struck her?
 
 
 27
 A:They left the scene.
 
 
 28
 Q:And she was the first witness to testify in this trial, was she not?
 
 
 29
 A:Yes.
 
 
 30
 At the conclusion of this testimony, counsel for the defendants moved for a mistrial. After determining that the government was not going to put on sufficient evidence to link the incident to any of the defendants, the district court denied the motion for mistrial but gave the jury the following curative instruction:
 
 
 31
 Ladies and gentlemen, in the cross-examination of this last witness, as far as any inference of some accident that may have happened to this witness as it relates to this case,
 
 
 32
 I would instruct you to completely disregard that. There is absolutely no evidence here nor will there be any presented that in any way relates to this case at all.
 
 
 33
 And it is something that shouldn't have been gotten into in any event. And I would instruct you to disregard it. It just has nothing to do with this case. Nobody knows the circumstances of the accident, and it just isn't a part of this case.
 
 
 34
 We are of opinion the trial court did not err in denying the motion for a mistrial. "The jury is generally presumed to be able to follow an instruction to disregard evidence, absent some strong indication that the evidence is so powerful that a jury could not ignore it and that the defendant would be harmed as a result." United States v. Jones, 907 F.2d 456, 460 (4th Cir. 1990), cert. denied sub nom., Johnson v. United States, 59 U.S.L.W. 3461 (1991). As in Jones, the evidence against the defendants is so abundant that there is no reasonable probability that the jury's verdict was influenced by the jury's exposure to this later-excluded evidence. 907 F.2d at 460.
 
 
 35
 Watkins and Gilbert next object to Doris Kay's statement that Gilbert told her that she had been in jail before. During the government's examination of Kay, the following exchange took place:
 
 
 36
 Government: Okay. Where did you sell it?
 
 
 37
 Doris Kay: Where did we sell it at? Right in Bragg Hill.
 
 
 38
 Q:Okay.
 
 
 39
 A:And me and her [ (Gilbert) ] just became good friends at this time. We talked about everything. And, you know, she told me about her daughter and, you know, that she had been to jail before. And, I don't know, we just became real good friends. And we even started shoplifting.
 
 
 40
 Counsel for appellants did not object to this testimony at the time it occurred. Later in the trial, he moved for a mistrial based on this testimony. Objections to the admission of evidence must be made timely to preserve the issue for appeal. Fed. R. Evid. 103(a)(1); United States v. Parodi, 703 F.2d 768, 783 (4th Cir. 1983) ("[t]imeliness of objection under the Rule requires that it 'be made at the time the evidence is offered ....' ") (quoting DiPaola v. Riddle, 581 F.2d 1111, 1113 (4th Cir. 1978), cert. denied sub nom., DiPaola v. Mitchell, 440 U.S. 908 (1979); cf. United States v. Polytarides, 584 F.2d 1350 (4th Cir. 1978) (mistrial motion is properly denied if granting a timely request for a curative instruction would remove any possible prejudice from the improper comments). The attorney, for tactical reasons, did not object at the time the evidence was offered.[2] Therefore, the issue was not preserved for appeal.
 
 
 41
 Finally, the appellants argue that Doris Kay's statement concerning the taking of a polygraph should have resulted in a mistrial. During cross-examination, the defense questioned Kay at length about the discrepancy between part of her testimony before the grand jury and that given at trial. After the defense attorney asked Kay, "And then you changed your story, right?" Kay responded,"I changed my story when I went to take a lie detector test." No objection was made at the time. Later, the defense, asserting that Kay had not passed a polygraph, moved to have permission to ask Kay if she had passed a polygraph. The judge denied the motion, but offered to give a curative instruction to the jury that they should disregard any reference to a polygraph. The defense declined this offer. Later, the defense questioned Kay concerning how many times she had met with federal agents following her grand jury testimony. In asking Kay how many times she had met with the agents, defense counsel stated, "All right. More than six?" Kay responded, "It wasn't that many. What happened was they wanted me to take a lie detector test-." Defense counsel interrupted her at that point, approached the bench, and again asked for a mistrial. The court denied the motion. The court then excused the jury and instructed Kay not to mention anything about the taking of a polygraph. Kay concluded her testimony without any further reference to a polygraph.
 
 
 42
 In United States v. Smith, 565 F.2d 292, 294-95 (4th Cir. 1977), the government questioned a witness about his having taken a polygraph. Defense counsel promptly objected. The court sustained the objection and gave a curative instruction telling the jury to disregard the improper question and answer. 565 F.2d at 295. We held that this was not reversible error. Similarly, in United States v. Tedder, 801 F.2d 1437, 1444-45 (4th Cir. 1986), cert. denied, 480 U.S. 938 (1987), we held that a witness' statement, during examination by the defense, that he "had spent twenty hours on the polygraph" did not require a mistrial when the defense counsel declined the court's offer to give a curative instruction.
 
 As we stated in Tedder:
 
 43
 We do not believe that this limited, inadvertent reference to the polygraph examination of a single witness entitled the defendant to a mistrial. First, the jury heard no evidence as to the results of the test, and while it may have assumed that the test buttressed [the witness'] credibility, it also observed h[er] during lengthy direct examination and crossexamination.
 
 
 44
 801 F.2d at 1445. In addition, like his counterpart in Tedder, defense counsel declined the court's offer to give a curative instruction. "By refusing a proffered curative instruction, defense counsel made a tactical decision to forego a remedy that we have repeatedly held to be adequate. This waiver does not entitle defendant to a new trial." 801 F.2d at 1445. Therefore, we are of opinion that the district court did not commit reversible error in refusing to grant a mistrial on the basis of Kay's mentioning a polygraph.
 
 Threats to Doris Kay and Her Children
 
 45
 Appellants assert that the district court erred in allowing the government to present evidence of threats to government witness Doris Kay and her children. Kay testified at trial that she lied before the grand jury "[b]ecause they had threatened me so many times that they would kill my kids and me." Prior to the trial, Kay's children were placed secretly with a foster family in Allegheny County, Virginia, a remote location some 150 miles from Alexandria, the place of trial.
 
 
 46
 Not even Mrs. Kay knew where her children were. One Amy Bradley watched the children in her home during the day. Mrs. Bradley testified that she received a phone call at her home from a black man asking for Mrs. Kay's children by their first names. She stated that he had a strange accent and did not sound like he was from Allegheny County. Two days after the call, someone broke into Mrs. Bradley's house. On that same day, Mrs. Bradley noticed a car outside with New York license plates which had been there also two days before. The children were moved the day after the break-in.
 
 
 47
 During trial, out of the hearing of the jury, the government's attorney stated that Mrs. Kay was going to testify about the threats she received in jail from Watkins. The defense did not object. She subsequently testified without objection that Watkins and Gilbert visited her in jail and "said that if I said anything about him or any of his people, that they would kill me and my kids." (Italics added). She then identified a letter she received through the mail while in jail that stated, "[I]f you testify, your kids will die." (Italics added). The court overruled the defense's objection to admitting this into evidence.
 
 
 48
 Defendants claim that admission of these threats directed at Mrs. Kay's children and the note received by Kay was error. The argument was that there was no evidence to link the defendants to these incidents. We disagree. Mrs. Kay testified that Watkins and Gilbert had, in person, threatened to kill her and her children if she testified against them. In addition, the New York license plate was significant because Watson and Gilbert purchased drugs from New York and had individuals from New York in their organization. We are of opinion that faced with these facts and the direct evidence of the explicit threats by Watkins and Gilbert to Mrs. Kay that they would kill her and her children, other like threats towards the children, even if only slightly connected to Watkins and Gilbert, were admissible, as well as other acts which might reasonably be construed to be in the execution of such a threat. In such a case, the district court's ruling as to competency should not be disturbed.
 
 Change in the Indictment
 
 49
 In Count 1 of the indictment, Watkins and Gilbert were charged with conspiring to commit several offenses. The first four of these were: (1) possession with intent to distribute 5 grams or more of cocaine; (2) distribution of 5 kilograms or more of cocaine; (3) possession with intent to distribute 50 grams or more of crack; and, (4) distribution of 50 grams or more of crack. Two weeks before the start of the trial the government moved to correct item 1 so that it would read "kilograms" instead of "grams." The district court granted the motion.
 
 
 50
 Watkins and Gilbert argue that the district court committed error in granting the motion. We are of opinion that this court's decision in United States v. Bledsoe, 898 F.2d 430 (4th Cir.), cert. denied, 59 U.S.L.W. 3391 (1990), is dispositive of the issue. In Bledsoe, the defendant was indicted for distributing crack within 1000 feet of a public secondary school. The only public school in the area was Wheeling Park High School. In fact, the distribution actually took place within 1000 feet of a private secondary school, Central Catholic High School. The district court granted the government's motion to delete the word "public" from the indictment. We affirmed, even though, as the dissent pointed out, this made "it possible for the defendant to be convicted of selling drugs within 1000 feet of Central Catholic High School when he was indicted for selling drugs within 1000 feet of Wheeling Park High School." 898 F.2d at 433.
 
 
 51
 The change of the indictment in the instant case is no more drastic than the alteration in Bledsoe. Changing the indictment to correct the quantity of cocaine had no effect on the elements of the crime. The statute under which the defendants were charged,s 841(a), "prohibits the distribution of any amount of cocaine." United States v. Campuzano, 905 F.2d 677, 679 (2d Cir.), cert. denied, 59 U.S.L.W. 3326 (1990). In addition, the defendants were put on notice by the second listed offense in the conspiracy charge. The second substantive offense mentioned in the conspiracy indictment was distribution of 5 kilograms or more of cocaine. Therefore, the defendants were put on notice that they would have to defend against an allegation of distribution of 5 kilograms or more of cocaine. Having to defend against possession with intent to distribute 5 kilograms presented no additional burden. The district court did not err in granting the government's motion to correct the indictment.
 
 Watkins' Statement
 
 52
 Parts of Watkins' statements made to FBI agent Charles Hagens following his arrest were introduced into evidence by the government, through Hagens' testimony. The statements were admissible in the case against Watkins as admissions of a party-opponent. See Fed. R. Evid. 801(d)(2)(A). However, the statements were hearsay as to the other defendants. See Fed. R. Evid. 801(d)(2) (a statement is an admission, not hearsay, only when offered against the party making the statement). It is unconstitutional to admit inadmissible hearsay evidence made by a nontestifying codefendant that implicates another defendant. Bruton v. United States, 391 U.S. 123 (1968). Therefore, Hagens was instructed not to mention Gilbert by name when testifying as to Watkins' statement.
 
 
 53
 Watkins argued at trial that, under the rule of completeness, he should be allowed to elicit from Hagens the entire content of Watkins' statement, including the naming of Gilbert as a participant. The court only restricted Hagens from identifying Gilbert or Cutia.
 
 
 54
 We are of opinion that Watkins' contention that the district court committed error in refusing to allow defense counsel to elicit from Hagens, Watkins' naming of Gilbert in his statement is without merit. If the trial court had done as Watkins' requested, Gilbert's rights under Bruton would have been violated.
 
 
 55
 Watkins' unredacted statement could have been used only if Watkins and Gilbert were tried separately or if Watkins testified. The Supreme Court has made clear that separate trials are not required in such instances.
 
 
 56
 It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.... Even apart from these tactical consider ations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.
 
 
 57
 Richardson v. Marsh, 481 U.S. 200, 210 (1987). In addition, the alternative of foregoing the use of a codefendant's confession was rejected because "[t]hat price also is too high, since confessions 'are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.' " 481 U.S. at 210 (quoting Moran v. Burbine, 475 U.S. 412, 426 (1986)).
 
 
 58
 The government, properly, was allowed to try the defendants jointly and introduce into evidence Watkins' self-incriminating statement. Bruton required that Gilbert not be incriminated by Watkins' statement. Given these constraints, we are of opinion the trial court did not err by admitting into evidence Watkins' statement with Gilbert's name redacted.
 
 Vagueness of the Indictment
 
 59
 Watkins and Gilbert argue that the district court erred in denying defense's motion for a directed verdict on the substantive counts on the rationale that the indictment was "fatally infirm in that it provides no specificity and no guidance whatsoever." Count 3 of the indictment is asserted by the appellants to be illustrative of the twenty-one substantive counts. It reads as follows:
 
 
 60
 In or about the Summer of 1988, in the Eastern District of Virginia, NATHANIEL WATKINS, aka "J.R.," and SHERRILLE GILBERT, aka "Mimsky," did knowingly, intentionally and unlawfully distribute 5 grams or more of a substance or mixture containing cocaine base, commonly known as "crack" cocaine, a Schedule II narcotic controlled substance.
 
 
 61
 (In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)
 
 
 62
 Because appellants never moved to dismiss the indictment prior to trial, we would have to find plain error in order to reverse for vagueness of the indictment.[3] Fed. R. Crim. P. 12(b)(2); United States v. Hallock, 941 F.2d 36, 39 n.2 (1st Cir. 1991); cf. United States v. Fogel, 901 F.2d 23, 25 (4th Cir.), cert. denied, 59 U.S.L.W. 3325 (1990) ("Because the appellant's objection to this indictment was made after the jury rendered its verdict, any review for alleged defect is to be reviewed, if at all, under a liberal standard and 'every intendment is ... indulged in support of the sufficiency.' " (citation omitted).
 
 
 63
 "[A]n indictment must charge all the essential elements of a criminal offense and sufficiently apprise the defendant of what he must be prepared to meet so he will not be misled while preparing his defense, and it must protect the defendant against later prosecution for the same offense." United States v. Hayes, 775 F.2d 1279, 1282 (4th Cir. 1985). All the essential elements of the criminal offense were charged in the indictment as the statute tracked the language of the statute. See United States v. Fogel, 901 F.2d at 25 ("An indictment that tracks the statutory language is ordinarily valid.") Each substantive count in the indictment alleged as the time frame either a season of the year, time of the year, a month, or a specific day. These time frames are sufficient. United States v. Dunnigan, 944 F.2d 178, 181 (1991) (indictment that identified the time frame of the activity as "early to late summer of 1988" is sufficient). In addition, each count stated which statute was alleged to have been violated. Therefore, the defendants had sufficient notice of the charges against them to prepare a defense. Finally, the indictment is clearly sufficient to protect the defendants from possible double jeopardy problems. We are of opinion the district court did not commit plain error in denying the defense's motion for a directed verdict based on the vagueness of the indictment.
 
 
 64
 In conclusion, we are of opinion the district court did not commit reversible error. Accordingly, the judgments of the district court in 91-5647 and 91-5648 are
 
 
 65
 AFFIRMED.
 
 HALL, Circuit Judge, dissenting:
 
 66
 I dissent from the majority's affirmance of the convictions because I believe that the cumulative prejudicial effect of the "threat" evidence, i.e. injury to one witness and implied threats directed at another witness's children, warrants reversal.
 
 I.
 
 67
 Hope Robinson was the government's first witness. Her sister, Angel Robinson, testified a week later for the defense. On crossexamination of Angel, the government elicited testimony concerning injuries suffered by Hope in a hit-and-run accident that occurred three days after Hope testified. The majority notes two reasons for rejecting appellants' argument that this line of questioning constitutes grounds for reversal: a curative instruction to the jury to disregard the evidence and abundant evidence of guilt. This concededly inadmissible line of questioning, however, was preceded by questioning of a similarly improper nature.
 
 
 68
 Doris Kay was one of the government's primary witnesses. Because of alleged pretrial threats made by appellants against her and her two young children, the children were secreted with a foster family some 150 miles from the trial situs. The children's daytime babysitter, Amy Bradley, was permitted to testify that she had received a phone call at the foster family's home asking for the children, that the home was broken into two days later, and that she had twice noticed a car with New York license plates outside the house. All of these events occurred approximately two months before the trial, while both of the appellants were in jail. The majority points to the direct evidence of threats by appellants towards Kay and her children and holds that the threats recounted by Bradley, "even if only slightly connected to Watkins and Gilbert, were admissible...." Slip op. 9. I believe that it was error to admit Bradley's testimony, and, in conjunction with Angel Robinson's inadmissible testimony, the total prejudicial effect of these errors warrants reversal of the convictions.
 
 A.
 
 69
 I accept as a general proposition that evidence of threats directed by a defendant to a witness is admissible on the issue of guilt. See United States v. Billups, 692 F.2d 320, 329-30 (4th Cir. 1982), cert. denied, 464 U.S. 820 (1983) (evidence of threats by defendant to intimidate a witness admissible to show consciousness of guilt). My initial point of departure from the majority involves the sufficiency of the evidence linking the defendants to the threats to Kay's children. The majority finds a link arising from the prior direct threat recounted by Kay and concludes that any "acts which might reasonably be construed to be in execution of such a threat" would be admissible. I disagree.
 
 
 70
 The admissibility of threat evidence often revolves around the balancing test of Fed. R. Evid. 403: is the probative value of the evidence outweighed by its prejudicial effect? See, e.g., United States v. Rocha, 916 F.2d 219, 240-41 (5th Cir. 1990) (setting forth a two-step analysis encompassing Fed. R. Evid. 404(b) and 403), cert. denied, 111 S.Ct. 2057 (1991). In this case, however, a more fundamental problem is the lack of a proper foundation. Because direct evidence that a defendant authorized the threat is usually unavailable, circumstantial evidence can be an acceptable alternative. However, the circumstantial evidence of a link to appellants-a telephone call from "a black man" with an accent, a burglary, and a car with New York plates -is woefully tenuous.
 
 
 71
 Cases abound in which appreciably stronger links were deemed inadequate. See generally C. Clifford Allen, III, Annotation, Admissibility in Criminal Case, on Issue of Defendant's Guilt, of Evidence That Third Person Has Attempted to Influence a Witness Not to Testify or to Testify Falsely, 79 A.L.R.3d 1156 (1977). The threats to Kay's children, if that is what in fact was described by Bradley, could have come from a competing drug conspiracy. Moreover, even if the threats came from a member of Watkins' group, it would take an additional inference that it came at Watkins' and/or Gilbert's direction. See Krulewitch v. United States, 336 U.S. 440 (1949) (holding that evidence of threat to witness by coconspirator, not made in furtherance of conspiracy charged in indictment, was inadmissible); see also United States v. Blackshire, 538 F.2d 569 (4th Cir. 1976).
 
 B.
 
 72
 Even if the link between the direct threats to Kay and the Bradley evidence were enough to clothe the latter with relevance, I believe that Fed. R. Evid. 403 would strongly militate against admissibility. The probative value of Bradley's testimony is minimal at best, and this value is overwhelmed by the prejudicial effect of the evidence. Threats "constitute a striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." United States v. Guerrero, 803 F.2d 783, 785 (3rd Cir. 1986) (internal quotation omitted). When the threats are directed at two children, the prejudicial effect reaches its apogee.
 
 
 73
 The balancing test under Rule 403 includes an evaluation of the need for the evidence. See Advisory Committee Notes, Fed. R. Evid. 403. The government arguably needed Bradley's testimony to bolster the credibility of Kay, particularly with regard to her testimony of a direct threat by Watkins. This specific threat formed the basis of count 23 of the indictment. In view of the direct evidence of the threat to Kay, the need for Bradley's testimony was lessened considerably. The Rule 403 scale tips decidedly to the side of prejudice, and I would hold that the district court abused its discretion in admitting such testimony.
 
 II.
 
 74
 As is usually the case when evidence was erroneously admitted, the concept of harmless error may be a means to avoid a reversal. "[T]he appropriate test of harmlessness ... is whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " United States v. Nyman, 649 F.2d 208, 211-12 (4th Cir. 1980) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). Only if "we believe it highly probable that the error did not affect the judgment" should we find an error harmless. Nyman, 649 F.2d at 212 (internal quotation omitted). On the record before us, I cannot say that it is "highly probable" that the threat evidence had no such effect on the jury's verdicts.
 
 
 75
 In assessing the impact of error, we look to the"closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." Gaither v. United States, 413 F.2d 1061, 1079 (D.C. Cir. 1969) (quoted in Nyman, 649 F.2d at 212); see also United States v. Urbanik, 801 F.2d 692 (4th Cir. 1986). No steps were taken to mitigate the effects of Bradley's testimony, and it is doubtful that the curative instruction regarding the evidence of the injuries to Hope Robinson lessened the impact of this evidence to any appreciable extent. The "issue affected" by the threat evidence cannot be confined to any discrete factual dispute; rather, the erroneously-admitted threat evidence tinted all other evidence offered against appellants. The "issue affected" is nothing less than guilt itself; innocent people do not retaliate against witnesses and threaten infants.
 
 
 76
 The government argues that the case against appellants was overwhelming, and the sheer number of government witnesses lends some support to this assertion. However, a number of the government's witnesses changed their stories at different points, and many were serving sentences for related crimes at the time of trial. Moreover, some of the same witnesses who testified against the appellants also testified against Cutia, yet Cutia was acquitted outright on two counts and received no verdict on seven others. Included among the counts on which the jury reached no verdict was count 1, the conspiracy charge common to all three defendants. Cf. United States v. Sanders, No. 905073 (4th Cir. April, 1992) (citing, as factors indicating closeness of a case, a hung jury at a prior trial, the length of jury deliberations, and conviction on a lesser included offense).
 
 
 77
 Inconsistencies abounded in this fairly complex conspiracy prosecution. The refusal of the jury to convict Cutia in and of itself demonstrates that this case was appreciably closer than the government now says it was. The potential for confusion, fueled by the extreme prejudicial effect of the threat evidence, leads me to conclude that the error was of sufficient magnitude that it cannot be deemed harmless.
 
 
 78
 I respectfully dissent.
 
 
 
 [1]
 The various papers may indicate a different number of counts on which Gilbert was convicted. No issue is made of this on appeal
 
 
 [2]
 Gilbert's attorney stated, "While she was testifying on direct she said that she and [Gilbert] talked about [Gilbert] going to jail. I didn't raise it then because I didn't want to underscore the issue, but based on her testimony, I would move for a mistrial."
 
 
 [3]
 The defense's motion for a bill of particulars was denied by the district court