52 F.3d 322
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Kyle Joseph MOMON, a/k/a Moo-Moo, a/k/a Cow, a/k/a Flavor
Flave, a/k/a Calvin Flavor, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rodney Roberto WALLACE, a/k/a Touch, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Yorky Dwayne BELL, Defendant-Appellant.
 Nos. 93-5870, 94-5245, 94-5252.
 United States Court of Appeals, Fourth Circuit.
 Submitted March 31, 1995.
Decided April 20, 1995.
 
 James S. Perry, Perry, Perry, Perry & Grigg, Kinston, NC; James M. Cooper, Cooper, Davis & Cooper, Fayetteville, NC; F. Blackwell Stith, Stith and Stith, P.A., New Bern, NC, for appellants. Janice McKenzie Cole, U.S. Atty., Jane H. Jolly, Asst. U.S. Atty., Raleigh, NC, for appellee.
 Before HALL and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Kyle Joseph Momon (a/k/a Calvin Flavor or Flavor Flave), Rodney Roberto Wallace (a/k/a Touch), and Yorky Dwayne Bell (a/k/a York), appeal their convictions for conspiracy to distribute crack cocaine, 21 U.S.C.A. Sec. 846 (West Supp.1994), conspiracy to possess firearms in relation to a drug trafficking offense, 18 U.S.C. Sec. 371 (1988), and maintaining a place (619 Larkspur Drive, Kinston, North Carolina) for the purpose of distributing crack, 21 U.S.C.A. Sec. 856 (West Supp.1994). Momon and Wallace were also convicted of maintaining another residence (2307 Susan Drive, also in Kinston) for the distribution of crack; they appeal this conviction as well. Wallace and Bell also appeal their sentences. We affirm.
 
 
 2
 In the spring of 1989, Wallace and Momon organized a scheme whereby packages of cocaine powder or crack cocaine, usually weighing about half a kilogram, were mailed from Los Angeles to Kinston, North Carolina, on a weekly basis. The cocaine powder was converted to crack, if necessary, and was distributed in crack form. With some interruptions, this arrangement persisted until August 1990. Wallace spent most of his time in Kinston until September 1989. He was in charge there initially, but Momon was dissatisfied with his handling of the money, and came to Kinston himself, bringing along Donald Romain, a friend from Los Angeles whom he trusted. Donald's brother Vincent first came to Kinston in the early summer of 1989 and stayed a week. He returned in September 1989, stayed until December, and returned again in February 1990; this time he remained until his arrest in August 1990. Momon also brought Yorky Bell to Kinston. He distributed crack during the summer and fall of 1989, and also collected money with Vincent Romain.
 
 
 3
 The packages at first were sent to an apartment on Susan Drive which Wallace rented. When their activities began to attract too much attention, Momon rented a house on Larkspur Drive as a base of operations, and had the packages mailed to other addresses in the area to avoid arousing suspicion. In September 1989, Wallace was arrested in Arizona while transporting a kilogram of cocaine powder to North Carolina. He was released on bond in December 1989 and returned to Kinston in April 1990. In December 1989, a package containing half a kilogram of crack was intercepted in Los Angeles and a controlled delivery was made to Brenda Edwards in Kinston. After Edwards' arrest, Momon fled. However, he returned in January 1990, rented a new house on Wilson Avenue, and continued the operation. Firearms were present in all three houses, and in vehicles used by the conspirators, and were carried by Wallace, Bell, and others, especially when collecting money. Momon also carried a firearm.
 
 
 4
 In August 1990, a search warrant was executed by state investigative agents at the house on Wilson Avenue after a package containing a half kilogram of crack was received from California. Some of the crack was distributed to Wallace before the Romains were arrested.
 
 
 5
 They subsequently implicated the other conspirators. Both Romain brothers testified against Wallace and Bell, who were tried together, and against Momon, who was tried with two other co-defendants. Numerous residents of Kinston who had involvement in or knowledge about the conspiracy also testified at both trials.
 
 
 6
 Momon attacks his conviction on two grounds. First, he argues that the jury's accidental entry into the courtroom while he and his codefendants were having their restraints removed made an impartial verdict impossible. He contends that a curative instruction would have been useless because it would have emphasized the incident. The district court's denial of a new trial on this ground is reviewed under the abuse of discretion standard. United States v. West, 877 F.2d 281, 293 (4th Cir.), cert. denied, 493 U.S. 869 (1989).
 
 
 7
 A mistrial or new trial is necessary only when the jury's view of the defendant in restraints is so inherently prejudicial that the right to a fair trial is denied. United States v. Moreno, 933 F.2d 362, 368 (6th Cir.), cert. denied, 502 U.S. 895 (1991). The defendant has the burden of showing that he was actually prejudiced when the jury had only a brief glimpse of him in restraints while being transported to and from the courtroom, as opposed to seeing him in restraints throughout the trial. Id. Actual prejudice may be determined by polling the jury either before the verdict or afterward to determine whether the incident has rendered any jurors incapable of deciding the case on the evidence. See United States v. Jones, 907 F.2d 456, 459 (4th Cir.1990), cert. denied, 498 U.S.1929 (1991); United States v. Garcia-Rosa, 876 F.2d 209, 236 (4th Cir.1989), cert. denied, 493 U.S. 1030, and cert. granted, vacated, and remanded on other grounds, 498 U.S. 954 (1990). Here, Momon did not request a poll of the jury and therefore cannot show actual prejudice. Therefore, we find that the district court did not abuse its discretion in denying a new trial on this basis.
 
 
 8
 Second, in a pro se supplemental brief, Momon asserts that he did not join the conspiracy and that the government's witnesses lied when they testified that he had participated in it. He also denies using firearms in relation to drug trafficking, and asserts that the government witnesses gave false testimony against him in this respect as well. A jury verdict must be sustained if there is substantial evidence to support it; the evidence is taken in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80 (1942). In this case, the trial evidence easily supports the jury's verdict.
 
 
 9
 Next, Wallace and Bell contend that the district court's frequent questions to the witnesses "destroyed the impartial and judicious courtroom atmosphere" and "gave the jury the impression that the judge was an advocate...." They point out that the court posed approximately 200 questions to Bell, the only one of the Appellants who testified.
 
 
 10
 The government argues that review of this issue is foreclosed by the Appellants' failure to object during trial. This Court has held, in United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir.), cert. denied, 63 U.S.L.W. 3259 (U.S.1994), that the failure to object to the district court's questioning of witnesses at trial precludes appellate review with one exception: when the district court's comments are so prejudicial that they deny a party a fair trial. Wallace and Bell do not identify any particular question as prejudicial. They argue only that the frequency of the district court's questions prejudiced them. The number of questions asked by the court, standing alone, does not come within the exception set out in Gastiaburo. Therefore, the issue need not be addressed on the merits. In any case, our review of the trial transcript reveals that the district court's questions were asked in a neutral and impartial manner.
 
 
 11
 Lloyd Dunn testified at both trials that sometime in 1989 a package containing four blocks of crack was received by Netha Walters, a friend of his. When she opened it and saw the crack, she asked Dunn to get rid of it. Dunn hid the crack in a field behind Walters' house. Afterward, he was beaten up, shots were fired into his house, and he was finally kidnapped at gunpoint and taken to Walters' house, where Momon was waiting, determined to recover the crack. Dunn's mother followed the drug dealers to Walters' house, displayed a gun, and told them she had called the police, whereupon Dunn was released. Walters eventually returned the package to Momon.
 
 
 12
 Shortly after Momon's conviction, Wallace requested a transcript of Momon's trial at government expense. He alleged that a transcript was necessary for his trial preparation, but did not give any specific reason why he needed the transcript. His motion was denied. At the Wallace/Bell trial, Dunn testified that Wallace and Bell were among those who kidnapped him. Following Dunn's testimony for the government, the attorneys for Wallace and Bell argued that Dunn's prior testimony constituted a statement discoverable under the Jencks Act, 18 U.S.C. Sec. 3500 (1988). After a brief hearing, the district court decided that prior testimony was not Jencks material and denied the defense motion for a mistrial.
 
 
 13
 Wallace and Bell now maintain that Lloyd Dunn's testimony during Momon's trial was a statement which was discoverable as Jencks material. They argue that the district court committed reversible error when it denied Wallace's pre-trial motion for preparation of a transcript of the Momon trial at government expense, and erred during their trial when it decided that Dunn's testimony in the Momon trial was not Jencks material which the government was obligated to produce.
 
 
 14
 The Jencks Act requires the government to produce any prior "statement" of a witness "in the possession of the United States" which is relevant to the witness' trial testimony. Wallace and Bell cite no authority for their contention that prior trial testimony is Jencks material. Several circuits have held that prior trial testimony is not within the scope of the Jencks Act because the witness statements contained therein are a matter of public record rather than being secreted within the government's files. United States v. Isgro, 974 F.2d 1091, 1095 (9th Cir.1992), cert. denied, 61 U.S.L.W. 3651 (U.S.1993); United States v. Harris, 542 F.2d 1283, 1293 (7th Cir.1976), cert. denied, 430 U.S. 934 (1977); United States v. Munroe, 421 F.2d 644, 645 (5th Cir.), cert. denied, 400 U.S. 851 (1970). Similarly, this Court found no Jencks violation by the government when a defendant was unable to obtain a transcript of a government witness' prior testimony because the court reporter is not an agent of the government. United States v. Lurz, 666 F.2d 69, 79 (4th Cir.1981), cert. denied, 455 U.S. 1005 (1982). In light of these authorities, the district court did not err in finding that Wallace and Bell were not entitled to a transcript of Dunn's prior testimony under the Jencks Act.
 
 
 15
 Wallace and Bell also contend that Dunn's prior testimony was evidence which the government was obligated to disclose under Brady v. Maryland, 373 U.S. 83, 87 (1963). Brady requires the government to disclose material evidence favorable to the defendant. Evidence is material if there is a reasonable probability that its disclosure would have resulted in a different outcome. United States v. Bagley, 473 U.S. 667, 682 (1985); United States v. Curtis, 931 F.2d 1011, 1014 (4th Cir.), cert. denied, 502 U.S. 881 (1991). Dunn's prior testimony was not material because his testimony was substantially the same at both trials. Although Dunn did not mention Wallace by name in Momon's trial, he did name Bell (known to him as "York") as one of those involved in his kidnapping. Dunn's prior testimony was not exculpatory or even useful for impeachment, and given the strength of the government's case against both Wallace and Bell, there is no reasonable probability that its disclosure would have affected the outcome of the trial. Therefore, Wallace and Bell are not entitled to a new trial on this ground.
 
 
 16
 Count 4 charged Wallace and Bell with knowingly maintaining the house at 619 Larkspur Road from July 1989 to February 1990 for the purpose of manufacturing, distributing, or using any controlled substance in violation of 21 U.S.C.A. Sec. 856(a)(1). To convict them, the government had to prove that they (1) knew the house was being used for drug activity, (2) exercised dominion and control over the premises, and (3) intended the house to be used for drug activity. United States v. Clavis, 956 F.2d 1079, 1090-93 (11th Cir.), cert. denied, 60 U.S.L.W. 3842, modified on reh'g, in part, 977 F.2d 538 (11th Cir.1992), cert. denied, 61 U.S.L.W. 3652 (U.S.1993). Isolated incidents of drug activity are not sufficient. Id. at 1090. Circumstantial evidence may permit the inference that the defendant maintained a place and intended to use it for drug distribution. United States v. Onick, 889 F.2d 1425, 1431 (5th Cir.1989).
 
 
 17
 Wallace and Bell contend that the evidence did not show that they regularly used the house on Larkspur for drug activity, or that either of them exercised dominion and control over the house. Wallace argues that the evidence shows only that he lived there briefly with his girlfriend, Kim Nettles, and that the drug activity took place only after he and Kim moved out of the house. However, the government's evidence showed that the utilities for Larkspur were in Wallace's name from July 1989 until February 1990. Receipts bearing his name were found there after the house was vacated. Vincent Romain testified that when he returned to Kinston in September 1989, Wallace was present at Larkspur with Momon, Bell, and others, and was actively involved in the conspiracy. Vincent Romain's testimony also established that while the Larkspur house was in use, packages were regularly received at other addresses, returned to Larkspur for cooking into crack when necessary, packaging, and distribution. Bell collected the package from Brenda Edwards' house during this time and took it to the Larkspur house. Vincent Romain packaged the crack for sale and Bell distributed it. According to Donald Romain, Bell lived at the house and had a right to a key to the door. Viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), this evidence was sufficient to prove that Wallace and Bell exercised dominion and control over the Larkspur house, and participated in the drug distributions carried out from the house.
 
 
 18
 Wallace and Bell next contend that the district court clearly erred in determining the amount of drugs to be used as relevant conduct in that it failed to determine the scope of their particular agreements. United States Sentencing Commission, Guidelines Manual, Sec. 1B1.3(a)(1)(B) (Nov.1993). Wallace objected during sentencing to the probation officer's recommendation that 5 kilograms of crack was attributable to him, asserting that his participation in the conspiracy ended with his arrest in Arizona in September 1989. However, at Wallace's sentencing hearing, the government pointed out that (1) Wallace started the conspiracy in the spring of 1989; (2) a half kilogram or one kilogram was received in Kinston every week or two during the life of the conspiracy; (3) Wallace returned to Kinston after his Arizona arrest; and (4) in August 1990 a part of the last shipment of crack was distributed to him, thus proving that his participation in the conspiracy continued to that time. Based on the evidence presented at trial, the district court found that 5 kilograms was a reasonable amount to attribute to Wallace for his participation in the conspiracy. Because the evidence established that Wallace was involved with far more than 5 kilograms of crack, his arguments on appeal that the government failed to prove the amount of drugs and that the court failed to determine the scope of his agreement are without merit.
 
 
 19
 Bell did not file a written objection to the amount of drugs attributed to him in the presentence report (5 kilograms of crack), nor did he challenge his career offender status. These uncontested findings gave him a base offense level of 40, a criminal history category of VI, and a guideline range of 360 months to life. On appeal, Bell contends that no specific quantity was reasonably foreseeable to him. Because Bell failed to challenge the recommended finding as to the amount of crack in the district court, the issue is reviewed for plain error, United States v. Olano, 61 U.S.L.W. 4421 (U.S.1993).
 
 
 20
 The trial testimony of Donald and Vincent Romain does not establish exactly how long Bell spent in North Carolina. However, Alexander Howard, who lived next door to the house on Larkspur, testified that he saw Bell there during the summer of 1989. Vincent Romain testified that Bell was living at the house on Larkspur when he returned to Kinston in September 1989. York was still there in November 1989, when he picked up the first package mailed to Brenda Edwards' house.* Vincent Romain testified that during the fall of 1989 a half a kilogram of crack was being sold every week, and that he and York distributed the crack and collected money together. Vincent Romain returned to Los Angeles in the first half of December 1989. Assuming Bell spent three months in Kinston--September to November 1989--he would have been directly involved with the sale of approximately six kilograms of crack. Therefore, the district court did not plainly err in finding Bell responsible for at least five kilograms of crack.
 
 
 21
 The convictions and sentences are accordingly affirmed. We grant Momon's motion for an extension of time to file a pro se supplemental brief. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 AFFIRMED
 
 
 *
 North Carolina State Bureau of Investigation Agent Rea arrested Edwards after the second package was intercepted; she stated that she had received a similar package about a month before, and that York had been one of those who came for it